**JEFFERSON COUNTY BOARD OF EDUCATION, et al., Appellants**

v.

**Chris FELL, as Father and Next Friend of L.F., et al., Appellees.**

**No. 2011–SC–000658–DGE.**

Supreme Court of Kentucky.

Sept. 20, 2012.

---

13. *Garrett Mining # 2 v. Rondal Miller*, 97–78726 at 8.

14. *See Hilen v. Hays*, 673 S.W.2d 713, 720 (Ky.1984).

Byron Edward Leet, Lisa Catherine De-Jaco, Anne Reed Maclean, Wyatt, Tarrant & Combs, LLP, Louisville, KY, Counsel for Appellants.

Teddy Bernard Gordon, Louisville, KY, James Bruce Miller, Norma Carter Osborne Miller, J. Bruce Miller Law Group, Louisville, KY, Sheila P. Hiestrand, Hughes & Coleman, Louisville, KY, Counsel for Appellees.

Grant Robert Chenoweth, Robert Lynn Chenoweth, Frankfort, KY, Counsel for Amicus Curiae, Kentucky School Boards Association; The Board Of Education Of Fayette County.

Everett Clay Hoffman, Priddy, Cutler, Miller & Meade, PLLC, Stephen T. Porter, Gerald A. Neal Louisville, KY, Counsel for Amicus Curiae, Cheryl Armstrong, Amicus Curiae, Jocelyn Moore; Patricia Kannapel; John Grossman; Seana Golder; Roger Bradshaw; Jefferson County Teachers Association; League of Women Voters of Louisville and Jefferson County, Inc.

Sheryl G. Snyder, Junis L. Baldon, Frost, Brown, Todd, LLC, Louisville, KY, Counsel for Amicus Curiae, The Louisville Urban League; The National Association for the Advancement of Colored People–Louisville Branch.

Mark Russell Cambron, Kentucky Commission on Human Rights, Louisville, KY, Counsel for Amicus Curiae, Kentucky Commission on Human Rights.

Michael A. Owsley, Samantha Lynn Propp, English, Lucas, Priest & Owsley, LLP, Bowling Green, KY, Counsel for Amicus Curiae, Central Kentucky Educational Cooperative; Green River Regional Educational Cooperative; Kentucky Educational Development Corporation; Kentucky Valley Educational Cooperative; Ohio Valley Educational Cooperative; Southeast/South Educational Cooperative; West Kentucky Educational Cooperative.

Opinion of the Court by Justice ABRAMSON.

The parents of fourteen Jefferson County schoolchildren brought this action claiming Kentucky Revised Statute (KRS) 159.070 grants their children a statutory right to attend the public school nearest their home. While the litigants have discussed extensively the particular student assignment plan adopted by the Jefferson County Public Schools (JCPS), this case, from its inception, has raised solely an issue of statutory construction, an issue that is of consequence in all 120 counties of the Commonwealth. Having considered the language of KRS 159.070, the remainder of Chapter 159 regarding "Compulsory Attendance," and the specific legislative history of KRS 159.070, we conclude that Kentucky public school students have no statutory right to attend a particular school. Appellant Jefferson County Board of Education and the Kentucky School Boards Association, which has appeared as *amicus curiae* in this case along with 159 other Kentucky school districts, are correct in asserting that student assignment within a school district in Kentucky is a matter that the legislature has committed to the sound discretion of the local school board. Accordingly, we reverse the erroneous decision of the Court of Appeals and reinstate the ruling of the Jefferson Circuit Court dismissing the Complaint in this action.

### STATEMENT OF RELEVANT FACTS

In the summer of 2010, Scott Arnold as Father and Next Friend of S.A. filed a Complaint in Jefferson Circuit Court claiming his son was denied the right to attend the elementary school nearest their home in contravention of KRS 159.070. This alleged statutory violation was the sole claim in the Complaint. The named Defendants were the Jefferson County

Board of Education and the then-Superintendent of JCPS, Dr. Sheldon Berman. (These Defendants are collectively referred to herein as "JCPS.") Through five amended complaints and eventually an Intervening Complaint, twelve other parents joined the lawsuit asserting identical violations of KRS 159.070 on behalf of their children. (The parents are collectively referred to herein as "Plaintiffs.")[1] JCPS filed a Motion to Dismiss pursuant to Kentucky Rule of Civil Procedure 12.02, and the Jefferson Circuit Court granted that motion on the grounds that the Plaintiffs' interpretation of the statute was simply incorrect. The circuit court concluded that "enroll" and "attend" are not interchangeable and held that the legislative history of KRS 159.070 established legislative intent not to equate the two words.

On appeal, the Court of Appeals reversed in a divided opinion wherein the majority concluded that "[t]he legislature has mandated that parents have the right to enroll their child in the school nearest their home and 'enroll' means for purposes of attendance." That court, in an unprecedented opinion, ordered JCPS to develop a new student assignment plan for the 2012–13 school year that was "reasonably consistent with KRS 159.070 and this Court's opinion." JCPS was directed to submit its new assignment plan to the circuit court for approval with the Court of Appeals indicating that the magnet schools, special language programs, special education programs and similar specialized programs that serve many of JCPS's approximately 99,000 students would not necessarily be abolished. Rather, "JCPS will have the opportunity to request that specific schools not be included in the statutory mandate

because the school serves specialized needs throughout the county." JCPS was deemed to have discretion to establish attendance areas and implement transportation plans for the district "limited only by reasonable compliance with constitutional and statutory law," apparently a reference to federal school desegregation law and KRS 159.070. From this far-reaching opinion which granted final authority on the proper assignment of public school students to a local circuit judge, JCPS sought discretionary review.

## ANALYSIS

### I. The Statutory Construction Issue Presented By Plaintiffs' Complaint.

Plaintiffs claim that Kentucky schoolchildren are entitled to attend the public school nearest their home, often referred to as their "neighborhood school," by virtue of the plain language of KRS 159.070. Although Plaintiffs have focused primarily on the last sentence of that statute, it is important to consider the statute in its entirety. KRS 159.070 states:

Each school district shall constitute a separate attendance district unless two (2) or more contiguous school districts, with the approval of the Kentucky Board of Education, unite to form one (1) attendance district. Controversies arising in attendance districts relating to attendance matters shall be submitted to the Kentucky Board of Education for settlement. In case an agreement suitable to all parties cannot be reached, the Kentucky Board of Education may dissolve a united district. In case of dissolution, each school district involved may

---

1. By the time the case reached this Court, four of the thirteen Plaintiffs had withdrawn because their children had been reassigned to a school that they were satisfied with through the normal administrative process by which

the parent of a JCPS student can seek a school reassignment. The remaining nine Plaintiffs are the parents of ten JCPS students.

unite with other contiguous school districts in forming a united attendance district or may act as a separate attendance district. *Within the appropriate school district attendance area, parents or legal guardians shall be permitted to enroll their children' in the public school nearest their home.*

(emphasis supplied). Simply put, Plaintiffs maintain that "enroll their children in the [nearest] public school" means that their children are entitled to attend that neighborhood school while JCPS maintains that "enroll" is not synonymous with "attend."[2] JCPS posits that Jefferson County schoolchildren may and do "enroll" as JCPS students at the school serving their home address but that enrollment means registering and does not automatically equate with attendance at that particular school. JCPS relies on accepted definitions of "enroll" and "attend," the language employed in other provisions of KRS Chapter 159, the specific history of KRS 159.170 and longstanding Kentucky jurisprudence regarding the role of local school boards in student assignment. With the issue before us properly framed, we turn to the principles of statutory construction that must guide our decision.

## II. The Governing Principles of Statutory Construction.

When construing a statute, this Court is presented with an issue of law which we address *de novo. Cumberland*

Valley Contractors, Inc. v. Bell County Coal Corp., 238 S.W.3d 644, 647 (Ky.2007). "The cardinal rule of statutory construction is that the intention of the legislature should be ascertained and given effect." *MPM Financial Group, Inc. v. Morton,* 289 S.W.3d 193, 197 (Ky.2009); *Saxton v. Commonwealth,* 315 S.W.3d 293, 300 (Ky. 2010) ("Discerning and effectuating the legislative intent is the first and cardinal rule of statutory construction."). This fundamental principle is underscored by the General Assembly itself in the following oft-quoted language of KRS 446.080(1): "All statutes of this state shall be liberally construed with a view to promote their objects and carry out the intent of the legislature...." In *Shawnee Telecom Resources, Inc. v. Brown,* 354 S.W.3d 542, 551 (Ky.2011), we summarized the basic principles of statutory construction as follows:

In construing statutes, our goal, of course, is to give effect to the intent of the General Assembly. We derive that intent, if at all possible, from the language the General Assembly chose, either as defined by the General Assembly or as generally understood in the context of the matter under consideration.... We presume that the General Assembly intended for the statute to be construed as a whole, for all of its parts to have meaning, and for it to harmonize with related statutes.... We also presume that the General Assembly did not

**2.** *Amicus Curiae* Kentucky School Boards Association ("KSBA") which represents 100% of the local public boards of education in Kentucky, states that this interpretation, "enroll" is not synonymous with "attend," is the one long accepted by school boards throughout the state. The KSBA and *Amici Curiae,* Central Kentucky Educational Cooperative, Green River Regional Educational Cooperative, Kentucky Educational Development Corporation, Kentucky Valley Educational Cooperative, Ohio Valley Educational Cooperative,

Southeast/South Central Educational Cooperative and West Kentucky Educational Cooperative, refer the Court to school attendance boundary maps for Fayette, Daviess, Grant, Christian and other counties as evidence that school districts beyond Jefferson County "neither interpret nor apply KRS 159.070 to create a geographic test when drawing school attendance zones." *Amici* KSBA and Board of Education of Fayette County at 8–9; Cooperative Brief at 2–3.

intend an absurd statute or an unconstitutional one.... Only if the statute is ambiguous or otherwise frustrates a plain reading, do we resort to extrinsic aids such as the statute's legislative history; the canons of construction; or, especially in the case of model or uniform statutes, interpretations by other courts....

(citations omitted).

Thus, we first look at the language employed by the legislature itself, relying generally on the common meaning of the particular words chosen, which meaning is often determined by reference to dictionary definitions.[3] *See, e.g., Caesars Riverboat Casino, LLC v. Beach,* 336 S.W.3d 51, 58 (Ky.2011) (employing dictionary to determine "common, ordinary meaning" of the verb "to arise" as used in long-arm service of process statute); *Devasier v. James,* 278 S.W.3d 625, 632 (Ky.2009) (using dictionary to determine common, everyday meaning of "communicate" in statute requiring mental health professional to warn intended victim of actual threat); *Malone v. Ky. Farm Bureau Mut. Ins. Co.,* 287 S.W.3d 656, 658 (Ky.2009) (using dictionary to define "agree" as used in Motor Vehicle Reparations Act settlement statute); *Commonwealth v. McCombs,* 304 S.W.3d 676, 681 (Ky.2009) (using dictionary to define "club" as used in statutory definition of a "deadly weapon"); *Clark v. Commonwealth,* 267 S.W.3d 668, 676–77 (Ky.2008) (using dictionary to define "employ," "authorize," "induce" and "produce" as used in penal statutes addressing sexual performance by minor).

■ The particular word, sentence or subsection under review must also be viewed in context rather than in a vacuum; other relevant parts of the legislative act must be considered in determining the legislative intent. *Petitioner F. v. Brown,* 306 S.W.3d 80, 85–86 (Ky.2010) (Statutory enactment must be read as a whole and in context with other parts of statute with "any language in the act ... read in light of the whole act."); *Democratic Party of Ky. v. Graham,* 976 S.W.2d 423, 429 (Ky. 1998) (Court cannot focus on "a single sentence or member of a sentence but [must] look to the provisions of the whole.").

■ However, this preliminary assessment may not resolve the issue if the statute's wording is ambiguous. As cogently stated in *MPM Financial Group,*

[w]hen the undefined words or terms in a statute give rise to two mutually exclusive, yet reasonable constructions, the statute is ambiguous. *Young v. Hammond,* 139 S.W.3d 895, 910 (Ky.2004); *See also Black's Law Dictionary* 88 (8th ed.2004), (defining ambiguity as: "An uncertainty of meaning or intention, as in a contractual term or statutory provision."); *Black's Law Dictionary* 73 (5th ed.1979) (a term is "ambiguous" when "it is reasonably capable of being understood in more than one sense").

289 S.W.3d at 198. Where the statute is ambiguous, the Court may properly resort to legislative history. *Id.; Fiscal Court of Jefferson Co. v. City of Louisville,* 559 S.W.2d 478, 480 (Ky.1977) ("The report of legislative committees may give some clue. Prior drafts of the statute may show where meaning was intentionally changed. Bills presented but not passed may have some bearing. Words spoken in debate

---

**3.** Again, this is consistent with the directive of the General Assembly contained in KRS 446.080(4): "All words and phrases shall be construed according to the common and approved usage of language, but technical words and phrases, and such other as may have acquired a peculiar and appropriate meaning in the law, shall be construed according to such meaning."

may be looked at to determine the intent of the legislature."). Often legislative history is referenced, even where a statute is. unambiguous, simply to underscore the correctness of a particular construction. *See Stephenson v. Woodward,* 182 S.W.3d 162, 172 (Ky.2005) (Resort to legislative history is unnecessary when the statute is "abundantly clear," but in case at bar "legislative history is enlightening and serves only to strengthen our foregoing conclusion.").

As noted, the Court may also apply time-honored canons of statutory construction. See, e.g., *Fox v. Grayson,* 317 S.W.3d 1, 8 (Ky.2010) (applying the statutory construction tenet referred to as *expressio unius est exclusio alterius* (the mention of one thing implies the exclusion of another)); *Economy Optical Co. v. Ky. Bd. of Optometric Examiners,* 310 S.W.2d 783 (Ky.1958) (applying canon of *"in pari materia"* ("in the same matter"): statutes should be construed together, should be harmonized where possible and should result in effectiveness of all provisions, especially where two acts are passed at the same legislative session and become effective on the same day).

### III. The Language of KRS 159.070.

Having detailed the general principles that guide our construction of statutes, we turn first to the language of KRS 159.070 that has been the focus of this litigation. The closing sentence of the statute states: "Within the appropriate school district attendance area, *parents* or legal guardians *shall be permitted to enroll their children in the public school nearest their home."* Plaintiffs make no effort to address the "common, ordinary" meaning of this language, dismissing JCPS's focus on the precise words employed, especially the use of "enroll" as opposed to "attend," as an "inane" or "silly" parsing of the statute. In fact, examining the actual language of the statute, as repeatedly noted by this Court, is the first order of business in statutory construction. *Shawnee Telecom Resources,* 354 S.W.3d at 551. The Court of Appeals noted the dictionary definition of "enroll" offered by JCPS but then dismissed it with the following conclusory statements: "The phrase 'enroll in' as commonly used means to be admitted to membership in a body or society. Thus, 'enroll in', in the context now discussed, reasonably means to become a student at the school nearest the child's home." In fact, this *ipse dixit* approach to statutory language falls short of the judiciary's obligation. While many words do have meanings that require little elucidation, even with relatively simple words like "arise," "communicate" and "club," *supra,* this Court has routinely consulted the dictionary rather than stating our own definition of the word. This case is no exception.

According to *Webster's II New College Dictionary* (1995), "enroll" is a transitive verb which means "1. To enter the name of in a record, register, or roll. 2. To roll or wrap up." The *American Heritage Dictionary of the English Language* (4th ed.2006) defines "enroll" as follows: *"v.tr.* 1. To enter or register in a roll, list, or record: enrolled the child in kindergarten; enroll the minutes of the meeting. 2. To roll or wrap up. 3. To write or print a final copy of; engross. *v. intr.* To place one's name on a roll or register; sign up: We enrolled in the army." While these definitions may give credence to the idea that implicitly one enrolls at or in a school for purposes of attendance there, it is also apparent that "enroll" does not in and of itself connote attendance. Indeed, "enroll" and "attend" are not synonymous. "Attend" has several different definitions but the most appropriate for our discussion is *"v.tr.* 1. To be present at: attended class." *American Heritage Dictionary, supra.* At

this juncture, regardless of how we might view the enrollment sentence in isolation, *i.e.*, even if we accept that the Plaintiffs' reading of that sentence conflating enrollment with attendance as the more commonplace meaning, it is imperative to place the sentence in context by looking at the remainder of KRS 159.070. *Democratic Party of Ky.*, 976 S.W.2d at 429 (Court cannot focus on "single sentence or member of sentence" but must address whole statute.).

KRS 159.070 recognizes the separateness of school districts across the state but also the ability of two contiguous districts to unite or unify. Thus the first sentence states: "Each school district shall constitute a separate attendance district unless two (2) or more contiguous school districts, with the approval of the Kentucky Board of Education, unite to form one (1) attendance district." The next sentence appears to create a mandatory administrative remedy for issues arising as to school attendance matters by stating that "[c]ontroversies arising in attendance districts relating to attendance matters shall be submitted to the Kentucky Board of Education for settlement." The scope of this administrative process, however, appears to be qualified in the third sentence: "In case an agreement suitable to all parties cannot be reached, the Kentucky Board of Education may dissolve a united district." This third sentence suggests that the "attendance matters" that are to be submitted to the Kentucky Board of Education are not the individual pupil assignment issues raised by Plaintiffs in this case but the larger issue of attendance districts in a "united district." In short, if the new unified district cannot work out attendance issues the Board of Education can dissolve the unified district, returning the districts to their original states. The fourth sentence continues to focus on this concept of separate vis-à-vis united school districts following dissolution of a unified school district: "In case of dissolution, each school district involved may unite with other contiguous school districts in forming a united attendance district or may act as a separate attendance district." These four sentences precede the enrollment sentence on which this case is premised. So, an examination of KRS 159.070 in its entirety discloses a statute focused on a united school district and attendance matters within that district as well as potential dissolution of a unified district and the return to separate districts.

JCPS points out that the old Louisville Independent School District and the Jefferson County School District were merged by order of the state Board of Education almost forty years ago, *Bd. of Ed. of Louisville v. Bd. of Ed. of Jefferson County*, 522 S.W.2d 854 (Ky.1975), and then posits that KRS 159.070 does not even apply to this case. While this position has some support based on a comprehensive reading of KRS 159.070, it is unnecessary to decide this issue to which little attention has been given by the litigants or lower courts. Even if the last sentence of KRS 159.070 is universally applicable to all Kentucky public schools, in unified and separate districts, and to all Kentucky schoolchildren, a full statutory analysis renders it apparent that the solitary sentence does not accord the neighborhood school attendance right which Plaintiffs claim.

## IV. The "Compulsory Attendance" Provisions of KRS Article XIII—KRS Chapter 159.

As important as it is for a court to scrutinize the particular statute *in toto*, our statutory construction principles also mandate considering the statute in context with other statutes surrounding it. *Petitioner F.*, 306 S.W.3d at 85–86 (statutory

enactment to be read as a whole and also in context with other parts of statute). This comes as no surprise because given that the cardinal rule of statutory construction is discerning legislative intent, it is entirely logical for the judiciary to see what else our General Assembly has said on the particular topic underlying the controversy.

KRS 159.070 appears in Title XIII of our statutes entitled "Education," a title which includes KRS Chapters 156–168, and more precisely in KRS Chapter 159, a portion of our education statutes entitled "Compulsory Attendance." Chapter 159 spans KRS 159.010 through KRS 159.990 and, among other things, includes provisions regarding Kentucky parents' obligation to "send" their children who are between the ages of six and sixteen to school (KRS 159.010); the transfer of a child from one district to another (KRS 159.020); attendance at private and parochial schools (KRS 159.040); loss of a student's driver license for dropping out of school (KRS 159.051); and truancy and habitual truancy (KRS 159.150). Obviously, some of these provisions have little or no bearing on the matter before us. However, various KRS Chapter 159 provisions do illustrate that the General Assembly has distinguished between the words "enroll" and "attend" for purposes of schools. One illustrative provision is the transfer provision applicable after a student moves. It provides in relevant part that the parent "*shall enroll* the child in a regular public day school in the district to which the child is moved, and the child *shall attend* school in the district to which he is moved for the full term provided by that district." KRS 159.020 (emphasis supplied). The exemptions from compulsory attendance at public schools recognized in KRS 159.030(1) include *inter alia* a child "(b) who is enrolled and in regular attendance in a private,

parochial, or church regular day school" and a child "(c) who is less than seven (7) years old and is enrolled and in regular attendance in a private kindergarten-nursery school." Of greatest interest, however, is KRS 159.010(1), the compulsory attendance statute for. children ages six to sixteen. It requires the parent of a Kentucky school age child to "send the child to a regular public day school for the full term that the public school of the district in which the child resides is in session or to the public school that the board of education of the district makes provision for the child to attend." This statute is important for two reasons: it illustrates the legislature's use of "attend" when it meant to refer to actual school attendance, but it also recognizes that a student must attend "*the* public school" that the board of the local school district has made provision for him or her to attend.

■■■ Having fulfilled our obligation to consider the language highlighted by the parties as well as the language of KRS 159.070 as a whole and the surrounding provisions of KRS Chapter 159, we cannot say that the statute as drafted by the General Assembly is "abundantly clear" and leaves no doubt as to legislative intent. *Cf. Stephenson*, 182 S.W.3d at 172. Plaintiffs' contention that their children must be allowed to enroll and attend the nearest school to their home is certainly one plausible reading of the statute, but it is also evident that the legislature has distinguished "enroll" from "attend" in other parts of the same KRS Chapter and, most notably, has recognized in its compulsory school attendance provision the requirement that a parent send his or her child/student "*to the public school that the board of education of the district makes provision for the child to attend.*" KRS

159.010(1) (emphasis supplied).[4] Significantly, this subsection is *the* compulsory school attendance mandate in Kentucky and it is not qualified by surrounding statutory language regarding separate, unified and dissolved school districts, as is KRS 159.070. So upon a full consideration of KRS 159.070 and other parts of the "Compulsory Attendance" statute, the enrollment sentence that closes KRS 159.070 is "reasonably capable of being understood in more than one sense." *MPM Financial Group*, 289 S.W.3d at 198. In short, it is ambiguous. *Id.*

## V. The Legislative History of KRS 159.070.

■ Where statutory language is ambiguous, Kentucky courts turn to legislative history. "Legislative history" is a broad term that encompasses several different categories of information. In *Fiscal Court of Jefferson County*, 559 S.W.2d at 478, this Court's predecessor high court mentioned legislative committee reports, prior drafts of the statute,[5] bills presented but not passed and legislators' comments in debates as examples of legislative history that can prove elucidating. Perhaps because the statute at issue in that case, KRS 67.083, was part of the newly-enacted "Home Rule" act which granted power to local fiscal courts, *Fiscal Court of Jefferson County* does not include within the ambit of legislative history prior versions of the statute itself. Nevertheless, the evolution of any statute from its prior embodiments to its present state is the purest form of legislative history. This type of legislative history focuses on the actual language adopted as law by the legislature through the years, and thus avoids the nuances and biases that might appear in extra-statutory materials such as committee reports or a single legislator's post-enactment comments. *See generally, Bd. of Trustees of the Judicial Form Retirement Sys. v. Atty. Gen. of Commonwealth*, 132 S.W.3d 770, 786 (Ky.2003) ("It is a basic principle of statutory construction that legislative intent may not be garnered from parol evidence, especially parol evidence furnished by a member of the legislature, itself."). This pure legislative history is particularly helpful, indeed dispositive, in this case, leaving no doubt about the proper construction of the final sentence in KRS 159.070.

Prior to March 29, 1976, KRS 159.070, with minor variations in sentence structure, appeared just as it does today, except it did not include the final "enrollment" sentence. House Bill 193, 1976 Ky. Acts, Ch. 79, added the following as the closing sentence of the statute: "Within the appropriate school district attendance area, parents or legal guardians shall be permitted to enroll *for attendance* their children in the public school nearest their home." (emphasis supplied). Thus, in 1976, KRS 159.070 unequivocally granted the "enroll for attendance" right which Plaintiffs claim continues to exist. Manifestly, the "for

---

4. Dismissing this language, Plaintiffs contend that the local school board must make provision for a student to attend his or her nearest school based on the statutory entitlement language in KRS 159.070. But that begs the question that if indeed that is the law, why the compulsory attendance statute would not simply say "to the public school nearest their home." In fact, there is no such legislative mandate and local boards retain discretion in school assignment matters.

5. We read "prior drafts of the statute" as precisely that, prior drafts that preceded the version of the statute the General Assembly eventually adopted. This series of drafts preceding enactment of a particular statute is distinguishable from prior duly-enacted versions of the statute effective in preceding years.

attendance" language is no longer in the statute. It was deleted in 1990 when the General Assembly enacted House Bill 940, the Kentucky Education Reform Act (KERA), a sweeping overhaul of Kentucky's public education system.[6] See 1990 Ky. Acts, Ch. 476. Interestingly, the deletion of the words "for attendance" was the only substantive change to KRS 159.070 effected by KERA.[7]

As noted by Judge Combs, the dissenting Court of Appeals judge in this case, *City of Somerset v. Bell,* 156 S.W.3d 321, 326 (Ky.App.2005), an opinion authored by then-Judge, now-Chief Justice, Minton is instructive on the import of legislative amendments omitting language from an existing statute:

> When interpreting a statute, "it is appropriate to consider the contemporaneous facts and circumstances which shed intelligible light on the intention of the legislative body." *Mitchell v. Kentucky Farm Bureau Mut. Ins. Co.,* 927 S.W.2d 343, 346 (Ky.1996). When a statute is amended, the presumption is that the legislature intended to change the law. *Whitley County Bd. of Ed. v. Meadors,* 444 S.W.2d 890, 891 (Ky.1969). Our Supreme Court has held that "in determining legislative intent certain presump-

tions are indulged. One of these is . . . where a clause in an old enactment is omitted from the new one, it is to be inferred that the Legislature intended that the omitted clause should no longer be the law." *Inland Steel Co. v. Hall,* 245 S.W.2d 437 (Ky.1952).

Consideration of the clear-cut legislative history of KRS 159.070 leaves no doubt that "enroll," as used in the last sentence, does not carry the weight ascribed to it by the Plaintiffs. Indeed, the omission of the modifying prepositional phrase "for attendance" must be viewed as purposeful legislative action. That deliberate act by our General Assembly in 1990 undercuts any suggestion that "enroll" in the final sentence of the statute connotes a mandate that Kentucky children be enrolled for attendance at their nearest school.

Our conclusion is further supported by recent legislative activity, specifically two bills presented but not passed. *Fiscal Court of Jefferson County,* 559 S.W.2d at 480 ("Bills presented but not passed may have some bearing.") Senate Bill 3 from the Regular Session of the 2011 General Assembly, which passed the Senate but not the House, among other things, proposed a revision to KRS 159.070 that

---

**6.** HB 940 was a direct response to *Rose v. Council for Better Educ., Inc.,* 790 S.W.2d 186, 189 (Ky.1989), wherein this Court found all of the Kentucky public education statutes unconstitutional for failing to "provide an efficient system of common schools" as required by Section 183 of the Kentucky Constitution.

**7.** Section 217 of H.B. 940 amended KRS 159.070 as follows:

Each school district shall constitute a separate attendance district unless two (2) or more contiguous school districts, with the approval of the State Board for Elementary and Secondary Education, unite to form one (1) attendance district. Controversies arising in attendance districts relating to

attendance matters shall be submitted to the State Board for Elementary and Secondary Education for settlement. [, and] In case an agreement suitable to all parties cannot be reached, the State Board for Elementary and Secondary Education may dissolve a united district. In case of dissolution, each school district involved may unite with other contiguous school districts in forming a united attendance district or may act as a separate attendance district. Within the appropriate school district attendance area, parents or legal guardians shall be permitted to enroll [for attendance] their children in the public school nearest their home.

added "for attendance" back to the statute with an exception for schools that have "academic or skill prerequisites" and schools with students who seek certain "curriculum offerings." [8] Similarly, Senate Bill 9 from the Regular Session of the 2012 General Assembly, which passed the Senate but not the House of Representatives, proposed a revision to the last sentence of KRS 159.070 which would add back in the words "for attendance." [9] This recent proposed legislation gives further credence to our conclusion that the enrollment referred to in the last sentence of KRS 159.070 does not connote an attendance right.

## VI. Harmony With Other Statutes and Consistency With Prior Law.

■ Finally, we note that our conclusion harmonizes KRS 159.070 with other parts of the Kentucky Revised Statutes beyond Chapter 159 and is consistent with prior decisions of this Court regarding the authority of local school boards. Such harmony and consistency are both factors frequently noted in statutory construction cases as further evidence of the appropriateness of a particular interpretation of a statute. *See, e.g., Johnson v. Branch Banking and Trust Co.,* 313 S.W.3d 557 (Ky.2010) (Construction of vehicle lien perfection statute, derived from considering dictionary definition and plain meaning, also resulted in harmony with other stat-

utes and was consistent with prior case law regarding security interest in vehicles.). Specifically, KRS 160.290(1) states:

> Each board of education shall have general control and management of the public schools in its district and may establish schools and provide for courses and other services as it deems necessary for the promotion of education and the general health and welfare of pupils, consistent with the administrative regulations of the Kentucky Board of Education. Each board shall have control and management of all school funds and all public school property of its district and may use its funds and property to promote public education. Each board shall exercise generally all powers prescribed by law in the administration of its public school system, appoint the superintendent of schools, and fix the compensation of employees.

In *Hines v. Pulaski County Bd. of Ed.,* 292 Ky. 100, 166 S.W.2d 37, 38 (1942), this Court's predecessor relied on an earlier, comparable version of this statute to state: "Undoubtedly appellant and the other students for whom he sues are entitled to the use of the facilities of the school in common with other children of the district, but, under the broad powers delegated to the board in section 160.290, KRS ... the board, not the pupil, has the right to deter-

---

8. S.B. 3 passed the Senate by a 21–17 vote. It was entitled "AN ACT relating to schools" and primarily addressed charter schools. The portion of the bill summary relating to KRS 159.070 stated: "amend KRS 159.070 to permit under certain conditions that a parent shall be permitted to enroll for attendance their children in the public school nearest their home." *http://www.lrc.ky.gov/record/11rs/SB3.htm.*

9. S.B. 9 is entitled and described as follows: "AN ACT relating to school attendance. Amend KRS 159.070 to permit a parent or

legal guardian to enroll for attendance a child in the school nearest to the child's home, except in cases in which there are academic or skill prerequisites for attendance in the school; provide that those residing the shortest travel distance to a school be given first priority in cases where the capacity of the school may be exceeded; permit a child to attend a school other than the one closest with permission of the district." The bill, as amended, passed 21–15 in the Senate but never came up for a vote in the House. See *http://www.lrc.ky.gov/record/12RS/SB9.htm.*

mine which school the latter shall attend...." In that case, the student was not attending the school nearest his home, but at some point he was reassigned to his neighborhood school where he was then denied admission due to overcrowding. The *Hines* Court held that the local school board could reassign him yet again back to the less crowded school but was required to underwrite the cost of his transportation to that school that was approximately five miles further from his home.

Thirty years later in *Skinner v. Bd. of Ed. of McCracken County*, 487 S.W.2d 903 (Ky.1972), the Court reiterated the broad powers of the local school board in rejecting a challenge to a new school boundary plan that would result in children attending schools other than those nearest their home. Although not citing KRS 160.090, *Skinner*, 487 S.W.2d at 905, states:

> School boards have wide discretion in the management of the school systems under their jurisdiction. This includes the location and number of school buildings, the transportation of pupils within the school system, and, in general, the management of the affairs of promoting education for the best interest of all citizens and pupils within the school district. It is not a proper judicial function for the courts to interfere with the administration of the internal affairs of a school system except in extraordinary circumstances. It is not an abuse of administrative discretion for a board of education to implement by a general overall plan the transportation of pupils within its system in such a manner as to use effectively and efficiently the physical facilities in the school district.

(citations omitted). While these cases were decided before the final sentence regarding enrollment at the nearest school was added to KRS 159.070, there is nothing in that sentence as it currently appears that would indicate a clear legislative intent to depart from the General Assembly's longstanding delegation of broad discretion to local school boards in school assignment matters. Indeed, the previously discussed history of KRS 159.070, as well as other parts of Chapter 159 and KRS 160.290, establish definitively that that discretion still resides at the local level and, more specifically, in the duly elected school board, not the local circuit judge.

## VII. Discerning Legislative Intent—Completing the Statutory Construction Process

The dissenters in this case have decided that there is only one reasonable reading of the language in KRS 159.070, and that their understanding perforce was the intent of the legislature. With all due respect to them, and to Justice Holmes and his adherents, what the legislature meant is the very heart of statutory interpretation in this Commonwealth.[10] While the "plain meaning of the statutory language," *Revenue Cabinet v. O'Daniel*, 153 S.W.3d 815, 819 (Ky.2005), is our first stop in discerning legislative intent, statutory interpretation is not a matter of simply offering numerous examples of the ordinary understanding of the focused-on, disputed word or phrase (which by its very nature must lend itself to some level of disagreement or there would not be litigation) or polling a thousand people on what they think the words mean. Statutory

---

10. The dissent relies heavily on Oliver Wendell Holmes, "The *Theory of Legal Interpretation*", 12 Harvard L.Rev. 417, 418 (1899), wherein he says the question is *"not what [this legislature] meant*, but what those words would mean in the mouth of a normal speaker of English ..."* (emphasis supplied).

construction is neither a populist exercise nor an elitist endeavor; it is a judicial obligation, an undertaking guided by time-worn principles, with the polestar being legislative intent.

We begin with the language that the legislature chose to use and we are obligated to look beyond one word, one phrase, one sentence, even one statute to the language used in other statutes pertaining to the matter in dispute. *Petitioner F.*, 306 S.W.3d at 85–86. If litigants come before this Court disputing the meaning of one phrase in one sentence of a certain statute, we must look at that statute in its entirety but also at surrounding statutes regarding the same subject matter because no one statute is more deserving of our attention and consideration than another, although admittedly only one may be, and usually is, the primary focus of the parties' dispute. Simply put, courts should not wear blinders and refuse to venture beyond a phrase or passage that one or more of the litigants offers up as dispositive. To read the language of KRS 159.070 and examine common dictionary meanings of "enroll" and "attend" before proceeding to consider other provisions of KRS Chapter 159 is not "engag(ing) in the advanced processes of statutory interpretation" on the basis of some "manufactured ambiguity" but rather simply doing what we are charged to do.

Legislative intent can only be determined in context and in the context of KRS Chapter 159 it is abundantly clear that the legislature has used "enroll" and "attend," often in the same sentence, to indicate two different concepts that are consistent with literal dictionary definitions which distinguish the two words as noted above. While the dissenters dissect the compulsory attendance statute, KRS 159.010(1), and find a different meaning, they never address the other instances in KRS Chapter 159 of "enroll/enrolled" and "attend/attendance" being used to convey different concepts. They also dismiss the very telling history of the statute itself, longstanding judicial precedents, and recent unsuccessful efforts to pass legislation directly on point to this controversy as basically indicative of nothing.

Looking to other provisions of KRS Chapter 159 and seeing the distinctive uses of "enroll" and "attend" is not "advanced" statutory construction—it is part of the basic, mandatory obligation to discern legislative intent and it points to the 'need to examine other relevant sources such as the history of the statute under review. Completing the statutory construction process renders the legislative intent clear.

The 1990 legislation changing "enroll for attendance their children in the public school" in KRS 159.070 to simply "enroll their children in the public school" is more than omitting a "redundancy" in language. To think otherwise flies in the face of the presumption that legislative amendments have purpose, namely to effect a change in the law, *Brown v. Sammons*, 743 S.W.2d 23, 24 (Ky.1988); and the more specific presumption that the omission of a clause means the "omitted clause should no longer be the law." *Inland Steel Co.*, 245 S.W.2d at 438. The dissents insist that the presumption does not apply here for no reason other than their own view that "for attendance" is redundant when "enroll their children in" standing alone means precisely the same thing.[11] As *Amici Curiae* KSBA and the Board of Education of

---

11. The majority has been unable to find another instance where this Court has dismissed a legislative amendment omitting specific language from a statute as being nothing more than editorial clean-up, *i.e.,* the excising of redundant language with no intent to affect the law.

Fayette County point out, there are five other instances in KRS Chapter 159 where "enroll" and "attend" are used and the 1990 Act left the "attend" or "attendance" language intact in each and every instance, while deleting "for attendance" only in KRS 159.070. *Amici* suggest, quite rightly, that this was a purposeful change to advance the creation of an *"efficient* system of public common schools," as mandated by *Rose v. Council for Better Education, Inc.*

Similarly, the dissenters dismiss two recent, failed attempts to return the language of KRS 159.070 to "enroll for attendance" as follows: "the better view is that such proposals merely suggest that their sponsors were well acquainted with the present litigation, and knowing the contortion that was afoot, sought to eliminate any claimed misperception about the meaning of the provision." If contortion was indeed afoot, why did neither bill clarifying the "true meaning" pass? It seems obvious why-both bills would bring about a change in the meaning of KRS 159.070, a meaning that is not currently there.

Faced with prior decisions of Kentucky's highest court that recognize the historic authority of the local school boards in matters of student assignment, *Hines v. Pulaski Co. Bd. of Ed.*, 166 S.W.2d 37, and *Skinner v. Bd. of Ed. of McCracken Co.*, 487 S.W.2d 903, the dissenters dismiss them as school overcrowding cases, stating that if there is overcrowding then the local board can deviate from the statutory command. With due respect, the overcrowding qualification is not in the opinions themselves. And if the General Assembly was aware of our precedent recognizing the historic authority of local school boards in student assignment and the actions of the school boards in their own districts assigning students without geographic directives from Frankfort, it defies logic that the General Assembly would deliberately omit "for attendance" in 1990 when what they really meant to do was to mandate that local school boards in our 120 counties assign students to the school nearest their home.

Finally, although our statutory construction is complete, we note the reality of public school education in Kentucky is completely consistent with our reading of KRS 159.070. JCPS, the KSBA, the Fayette County Board of Education and the cooperatives representing virtually every local board of education in the state have interpreted KRS 159.070 just as we do and as the trial court did. While their longstanding practice is not part of our analysis and would never be a basis for adopting a statutory interpretation contrary to legislative intent, it does give lie to the dissenters' suggestion that the majority has been lured into a surreal world. In fact, we are very much in the real world. In Eastern Kentucky, the mountainous terrain poses particular problems for local school boards in determining bus routes, school assignments and even where to build a school that is most accessible to the most people. In other areas, including urban areas like Jefferson County, there are no mountains but there are transportation routes, school capacities, residential/commercial development patterns, and numerous other factors that affect student assignment. Indeed, every single local school board has to know its district and make decisions that are best suited to its student population. The dissenters would undo this system of local control and basically reduce school assignment to measuring the distance from the front door of a home to the front door of a school, with the final say on where children attend school residing in the local circuit judge. If nothing else, that particular "world" is heretofore unknown in Kentucky.

## CONCLUSION

■ Plaintiffs, like most parents, care about the education of their children, and clearly their sincere parental concern prompted this lawsuit. They prefer that their children attend the school nearest their home and contend that KRS 159.070 mandates that result. However, the Jefferson Circuit Court was absolutely correct in dismissing their Complaint for failure to state a claim on which relief can be granted. Kentucky law does not grant a statutory right for schoolchildren to attend the school nearest their home. This conclusion is based on the language of KRS 159.070, the other provisions of KRS Chapter 159 and the legislative history of KRS 159.070 as well as on consideration of other relevant statutory and judicial authority. In short, the assignment of pupils to schools within a school district is a matter our General Assembly has committed to the sound discretion of the local school board. If Plaintiffs seek change in the JCPS student assignment plan, their recourse is at the ballot box when members of the Jefferson County Board of Education are elected by the voters. For these reasons, we reverse the Court of Appeals opinion and reinstate the ruling of the Jefferson Circuit Court dismissing this action.

MINTON, C.J.; NOBLE, SCHRODER, and SCOTT, JJ., concur.

CUNNINGHAM, J., dissents by separate opinion in which VENTERS, J. joins.

VENTERS, J., dissents by separate opinion in which CUNNINGHAM, J., joins.

CUNNINGHAM, J., Dissenting:

I concur completely with Justice Venters' excellent dissent. With profound respect for my brothers and sisters in the majority, I feel that the decision of the Court today, as well-intended as it may be, is strictly result driven. As hard as I try, I cannot read the statute in any way other than in its plain meaning. And if we ask a thousand people what is meant by the term "enroll in," I vouch that every single person would say it includes the right to attend. According to the majority, the term doesn't mean much.

Let's take the interpretation given by the majority out onto the streets where parents, children and school administrators live and work.

Mrs. Morris gets a telephone call from Mr. Brown, the principal at Neighborhood Elementary School. "Good morning, Mrs. Morris. I'm pleased to tell you that Timmy will be allowed to enroll in Neighborhood Elementary School next Monday morning, the school nearest to your home." Being an astute listener, Mrs. Morris is happy to hear the words "enroll in" and not "enroll at." On Monday morning, little Timmy is scrubbed to a bright sheen, his hair slick and parted, and he is laden with a spanking new back pack, fresh pencils, paper and other school items. Mrs. Morris takes him to Neighborhood Elementary School and signs him in. Timmy is then ushered onto a school bus and transported ten miles away to start his first day of school. I would be very doubtful if Mrs. Morris climbs back into her minivan and goes quietly away. She has, in fact, been deceived and misled by the very school system charged with teaching our children honesty and integrity.

For us to interpret this phrase in any way other than the plain meaning of the words is to legislate. We should leave that to our General Assembly. I respectfully dissent.

VENTERS, J., joins.

VENTERS, J., Dissents By Separate Opinion:

For the reasons expressed herein, I dissent. The Majority labors at great length to explain how a statute, so plain and obvious on its face, is actually a riddle that only lawyers and school administrators can understand. I respectfully submit that the sentence: "Within the appropriate school district attendance area, parents or legal guardians shall be permitted to enroll their children in the public school nearest their home" plainly and without ambiguity means that parents are entitled to send their children to be educated in the school located nearest to their residence.

## I. THE MAJORITY IGNORES THE ESSENTIAL PURPOSE OF JUDICIAL STATUTORY CONSTRUCTION

The purpose of the court's involvement in the interpretation of a statute is to clarify its meaning when its words are not clear. Upon reading KRS 159.070, the "normal speaker of English" [12] would have no doubt whatsoever that parents in Kentucky could send their children to be educated in the public school, within their school district, that was nearest to their home. Swayed by the Jefferson County Board of Education and the other school system administrators who joined this suit as *amici curiae*, the Majority has forgotten the judge's most fundamental duty in applying the law: "When the statute's language is plain, the sole function of the courts—at least where the disposition required by the text is not absurd—is to

enforce it according to its terms." *Lamie v. U.S. Trustee*, 540 U.S. 526, 534, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004).[13] The legislature "says in a statute what it means and means in a statute what it says there." *Connecticut Nat. Bank v. Germain*, 503 U.S. 249, 254, 112 S.Ct. 1146, 117 L.Ed.2d 391 (1992).

> The plain meaning of the statutory language is presumed to be what the legislature intended, and if the meaning is plain, then the court cannot base its interpretation on any other method or source. We 'ascertain the intention of the legislature from words used in enacting statutes rather than surmising what may have been intended but was not expressed.' In other words, we assume that the '[Legislature] meant exactly what it said, and said exactly what it meant.'

*Revenue Cabinet v. O'Daniel*, 153 S.W.3d 815, 819 (Ky.2005)(Internal citations omitted).

With respect to a court's interpretation of statutory language, Justice Oliver Wendell Holmes wrote:

> Thereupon we ask, not what this [legislature] meant, but what those words would mean in the mouth of a *normal speaker of English*, using them in the circumstances in which they were used, and it is to the end of answering this last question that we let in evidence as to what the circumstances were. But the normal speaker of English is merely a special variety, a literary form, so to speak, of our old friend the prudent

---

12. *See* Oliver Wendell Holmes, *The Theory of Legal Interpretation*, 12 Harv. L.Rev. 417, 418 (1899)(the question is "not what this [legislature] meant, but what those words would mean in the mouth of a normal speaker of English....").

13. In *Lamie*, the United States Supreme Court quoted from *Hartford Underwriters Ins. Co. v. Union Planters Bank, N.A.*, 530 U.S. 1,

6, 120 S.Ct. 1942, 147 L.Ed.2d 1 (2000), which in turn quoted *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 438, 119 S.Ct. 755, 142 L.Ed.2d 881 (1999); *United States v. Ron Pair Enterprises, Inc.*, 489 U.S. 235, 241, 109 S.Ct. 1026, 103 L.Ed.2d 290 (1989); and *Caminetti v. United States*, 242 U.S. 470, 485, 37 S.Ct. 192, 61 L.Ed. 442 (1917).

man.... We do not inquire what the legislature meant; we ask only what the statute means.[14]

This Court has frequently noted that when the language of a statute is clear, it will be held to mean what it plainly expresses, and we are not at liberty to supply additional words to that meaning. *Metzinger v. Kentucky Retirement Systems,* 299 S.W.3d 541, 546 (2009). The majority's construction of KRS 159.070 plainly violates this fundamental principle. When we say that a statute like the one involved here, written in plain, simple, and easily understood English does not really mean what it says, we sow the seeds of doubt about the meaning of *any* statute and undermine public confidence in the stability of statutory law. The attempt to "clarify" a statute that is plain on its face is tantamount to rewriting the statute. It is an improper intrusion upon the prerogatives of the legislative branch.

As Justice Cunningham so clearly illustrates in his separate dissent, Justice Holmes's "normal speaker" of the English language would have no difficulty at all discerning what KRS 159.070 means. As it now exists, the meaning of the statute is plain to anyone fluent in English. However, the Jefferson County Board of Education and the other school administrators allied with them are not comfortable with the statute as it is plainly written because, they say, it makes their job more difficult and it fails to achieve the social goals which they deem to be more laudable than going to a neighborhood school. So, they argue in Orwellian "newspeak" that while the law says that a child has a right to be enrolled in the neighborhood school, she

has no right to be a member of the student body of that school. Would anyone really believe that if a boy "enrolled" in Boy Scout Troop 79, he would not become a member of Troop 79? Or, that if a girl enrolled in Sunday school at the First Baptist Church, she would *not* be a member of a Sunday school class at that church? Would anyone fluent in English really believe that a person who "enrolled" in an employee insurance plan would not be a member of that plan? Or the Rotary Club, the United States Army, the Book-of-the-Month club, or anything else that a person can "enroll in?" Enrolling in the school nearest one's home plainly means becoming a member of the student body at that school. There is no other reason to "enroll" in an entity except to become a member of that entity.

The school board's "you can enroll, but you cannot attend" interpretation, which was adopted by the majority, would be more credible in the surrealistic world of The Eagles' song *Hotel California* where "you can check-out any time you like, but you can never leave."[15]

Appellants have lured this Court into that surreal world by creating the illusion of ambiguity, and then claiming that an ordinary person cannot readily understand the meaning of "enroll" in the statutory phrase "enroll their children in the public school nearest their home." Feigning confusion, they then look about for something to sustain their wish for a different law. Ordinarily, the courts have not naively bought into such manufactured ambiguities. See *Mid–Con Freight Systems, Inc. v. Michigan Public Service Com'n,* 545 U.S. 440, 462 (2005) ("Comparison with

---

14. Holmes, *supra* note 1, at 417–419 (emphasis added).

15. THE EAGLES, *Hotel California, in* HOTEL CALIFORNIA (Elektra Entm't 1976) (written by Don

Felder, Glenn Frey & Don Henley ©1976 Long Run Music, Fingers Music, WB Music Corp. (ASCAP) (Copyright in dispute)).

predecessor statutes cannot be used to create ambiguity about the meaning of an otherwise clear statute."); *See Kentucky Ass'n of Counties All Lines Fund Trust v. McClendon,* 157 S.W.3d 626, 633–34 (Ky. 2005)(The fact that a party attempts to muddy the water and create some question of interpretation [in a contract] does not necessarily create an ambiguity.).

Further, we have heretofore consistently said that where the existing statute is not ambiguous on its face, reference may not be had to the former statutes for the purpose of construction. *See Heringer v. Rolf,* 287 S.W.2d 149, 150 (1956). It is impossible to understate the significance of this principle, which the Majority opinion offends with impunity. In a nation founded on the rule of law, it is of vital importance that citizens have access to the law as it is written. Under the Majority's view, a person cannot know the "real" meaning of KRS 159.070 by reading it; instead, one has to decode it by reading what the law *used to be* before 1990. The current law books are of limited value if one must resort to former, obsolete editions in order to understand what the current law "really" means.

Only when the language of a statute would produce an injustice or ridiculous result are we authorized to look behind the plain meaning of the statute to other sources that would aid in discerning what the legislature might have intended the legislation to achieve. *Revenue Cabinet v. O'Daniel,* 153 S.W.3d at 819. Obviously, as argued by Appellees, who are parents within the Jefferson County public school system, the meaning expressed by the plain words of the statute is not ridiculous and it does not produce an unjust result. To the contrary, it produces a popular social objective that is no less respectable than the worthy social policy the school boards desire to achieve.

So, despite the plain meaning of the statute, the Majority embarks upon the road of statutory re-construction. Let us now follow them down that path to show, despite the school board's claims, that, like it or not Kentucky law supports a parent's decision to send their child to the appropriate school within his school district that is nearest to his home.

## II. TO "ENROLL IN A PARTICULAR SCHOOL" ENCOMPASSES THE CONCEPT OF BECOMING A STUDENT IN THAT SCHOOL

As noted above, I believe the Majority errs by undertaking to decide the meaning of a statute that is clear on its face. I agree with the Majority that when a statute is ambiguous, our duty requires that we ascertain its meaning so as to give effect to the intent of the General Assembly. But no rule of interpretation requires us to utterly ignore the plain meaning of words in a statute. *Gold Trading Stamp Co. v. Commonwealth,* 224 Ky. 136, 5 S.W.2d 910, 911 (1928).

The ambiguity asserted by Appellants and accepted by the Majority to justify the hunt for legislative intent is said to arise from the single word "enroll." Obviously, a single word can have a multitude of different meanings. In fact, almost every word in any language has a variety of meanings. If the different meanings of a single word were enough to render a statute ambiguous, then *all* statutes would be ambiguous. They are not. Speakers and readers of the language depend upon the word's context to dispel the ambiguity inherent in the single word standing alone. Thus, the question is not whether a single word within the statute is ambiguous—*the question is whether the statute as a whole is ambiguous.*

Here, as in most cases, the context removes any ambiguity in the meaning of

"enroll." So that the word "enroll" can be seen in context, here is the entire statute under review. KRS 159.070 is titled "Attendance districts—Enrollment permitted in school nearest home." The text provides as follows:

> Each school district shall constitute a separate attendance district unless two (2) or more contiguous school districts, with the approval of the Kentucky Board of Education, unite to form one (1) attendance district. Controversies arising in attendance districts relating to attendance matters shall be submitted to the Kentucky Board of Education for settlement. In case an agreement suitable to all parties cannot be reached, the Kentucky Board of Education may dissolve a united district. In case of dissolution, each school district involved may unite with other contiguous school districts in forming a united attendance district or may act as a separate attendance district. *Within the appropriate school district attendance area, parents or legal guardians shall be permitted to enroll their children in the public school nearest their home.*

*Id.* (emphasis added).

It is readily seen that the more specific disagreement is not the meaning of "enroll," but rather, what it means "to enroll *in* the public school." KRS 446.080(4) tells us that in interpreting the meaning of a statute, "[a]ll words and phrases shall be construed according to the common and approved usage of language...." Merriam–Webster defines the verb "enroll," as relevant here, as follows: "1: to insert, register, or enter in a list, catalog, or roll <*the school enrolls about 800 pupils*>."[16]

The dictionary also gives the following examples of the term: "*The college enrolls about 25,000 students* [;] They *enrolled* several volunteers for the study."[17]

It is not at all surprising that Merriam–Webster uses the school enrollment and college enrollment as examples because, of course, the verb phrase "to enroll in" has a universally known and accepted meaning when used in the context of school-attendance matters. To enroll in the University of Louisville does not mean *to apply* for admission to college with the hope of eventually being permitted to attend the college. It means having one's name placed upon the roster (the "*roll*") of students that attend the college; it means becoming a member of the student body in *that* college, not the student body of some other college. Similarly, in a private high school context, to enroll in Country Day School means the student will be attending classes in *that* school, not another one. And in the public school context, by common if not universal usage, particularly within the context of the idiomatic phrase "to enroll *in*," it means that a particular student who has "enrolled" in a school will attend that school to the exclusion of any other. *This* is the "common and approved" usage of the term "to enroll" in the context we examine.

The Majority's view is that the right to enroll a child *in* the public school nearest to home, as stated in the statute, simply means that a parent may register the child *at* the school building, within the school district, closest to home, with no legitimate expectation that the child will actually be enrolled as a student in that school.[18] No-

---

16. *Enroll Definition*, MERRIAM-WEBSTER.COM, http://www.merriam-webster.com/dictionary/enroll (last visited September 20, 2012)(emphasis added).

17. *Id.* (emphasis added).

18. So strange, indeed, is the school board's interpretation of the statute that, according to Appellees, no parents in the Jefferson County system have yet availed themselves of the opportunity to register their child for school

body talks about which school a child will be attending in that way; accordingly, it is clear that the Majority's interpretation is not pursuant to the common and approved usage of the term "to enroll in," particularly in the school-attendance context, and is therefore in violation of KRS 446.080(4).[19]

The obvious meaning of the statute in dispute is further proven by reference to the use of the term in court decisions from one end of the country to the other. Among the scores of cases applying this usage are the following, all of which equate *enrolling* in a school with actually attending classes there: *Mei Hua Zheng v. Attorney General of U.S.*, 410 Fed.Appx. 516, 518 (3rd Cir.2011) ("We agree with the Agency that Zheng's expulsion, *inability to enroll in another school,* and brief encounter with police who warned her not to attend church—viewed individually or cumulatively—do not satisfy the high standard for persecution."); *Foulke by Foulke v. Foulke*, 896 F.Supp. 158, 161 (S.D.N.Y. 1995) ("By asking this Court to permit Kirsten to *enroll at Rye Country Day'* until such time as the New York State Supreme Court completes an evidentiary hearing in [the divorce] action and determines final custody of the plaintiff,' the relief sought in the order to show cause, he is asking that this Court review the correctness of the State court order."); *Brenner v. Little Red School House, Ltd.*, 302 N.C. 207, 274 S.E.2d 206, 208 (1981) ("By his complaint filed 17 July 1979, plaintiff sought a refund of the $100.00 confirmation fee and $972.00 advanced tuition which he had paid to defendant pursuant to a contract by which defendant agreed *to enroll plaintiff's son in the fourth grade class of defendant school* and to teach him for the 1978–79 school session."); *Walsh v. Louisiana High School Athletic Ass'n,* 428 F.Supp. 1261, 1263 (E.D.La.1977) ("That rule restricts the eligibility of a child to compete in inter-scholastic high school athletic contests if the child, upon completion of the seventh or eighth grade, *enrolls in any high school* other than the one in the child's home district.");[20] and *In re C.,* 39 A.D.2d 964, 333 N.Y.S.2d 630, 631 (.1972) ("The Family Court went further however, and issued the order appealed from, which directs appellants *to enroll the children at a school outside of the district* where respondents reside, which school, incidentally, was the one which respondents want their children to attend.").

Appellants's methodology is transparent: they contort the rather simple vocabulary word *enroll* with an *ad hoc* definition in order to achieve their desired result. Henceforth, being enrolled in a particular school no longer means that one is a student in that school. As further discussed below, upon examination, the rationale supporting Appellants's view, as adopted by the Majority in support of this *ad hoc* definition, is seriously flawed.

### III. THE MAJORITY'S DECISION TO INTERPRET KRS 159.070 IS IMPROPER AND ITS INTERPRETATION OF THE STATUTE IS NOT CORRECT

The only way the Majority can avoid the plain meaning of the statute is to proclaim its inability to understand what it means "to enroll in a school." The Majority

at the nearest school building. Obviously, the parents themselves do not construe the statute as providing what the school system claims it provides.

**19.** If the legislature intended the meaning that the Majority suggests, it could have more precisely expressed its intent with this phras-

ing: "enroll ... *at* the public school nearest their home."

**20.** Reversed on other grounds on appeal in *Walsh v. Louisiana High School Athletic Ass'n,* 616 F.2d 152 (5th Cir.1980).

thereby creates the need to engage in the advanced processes of statutory interpretation. However, it is fundamental that courts may not manufacture ambiguity in order to avoid the plain language of a statute. *U.S. v. Page*, 167 F.3d 325, 331 (6th Cir.1999) ("[a] statute is not deemed ambiguous 'merely because it [is] possible to articulate a construction more narrow than that urged by the Government' or because reasonable judges disagree in their interpretations of the statute."). *See also Grayned v. City of Rockford*, 408 U.S. 104, 112, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972) (quoting *American Communications Ass'n, C.I.O. v. Douds*, 339 U.S. 382, 412, 70 S.Ct. 674, 94 L.Ed. 925 (1950)("It will always be true that the fertile legal 'imagination can conjure up hypothetical cases in which the meaning of (disputed) terms will be in nice question.' ").

With that preliminary criticism, I next address the specific points raised by the Majority to support its peculiar interpretation of this statute.

**A. The Plain Meaning of KRS 159.070 is Fully Consistent and Compatible With The Compulsory Attendance Law, KRS 159.010(1).**

The majority's conclusion that other sections of KRS Chapter 159 compel the adoption of its interpretation of KRS 159.070 is unconvincing. In its survey of KRS Chapter 159, the Majority identifies the statute "of greatest interest" as KRS 159.010(1), the compulsory attendance statute for children ages six to sixteen. This provision requires the parent of a Kentucky school age child, except as provided in KRS 159.030, to "send the child to [either] *a regular public day school* for the full term that the public school of the district in which the child resides is in session *or* to *the public school that the board of education of the district makes provision for* the child to attend." (empha-

sis added). The majority concludes that this statute illustrates the legislature's designation of the school board as the authority to decide what school a student in the public school system must attend. That, however, is incorrect.

The phrase relied upon by the Majority follows the disjunctive "*or.*" It therefore does not apply to children attending a "regular public day school." Thus, only as to children *not* attending regular public day school will the school board of the district make provision for the child to attend a specific school. This section of the law is an obvious reference to children attending something other than the regular public day school, for example, magnet schools, vocational schools or special needs schools. In those situations, the statute confers the school board with discretion to make provision for which school the student will attend.

The vast majority of children attending public school will be attending a *regular public day school.* By its plain language and grammatical construction, the second section of KRS 159.010(1) does not apply to them. It applies only to the relatively few students who will not be attending a regular public day school. KRS 159.010(1) is, therefore, in complete harmony with the plain meaning of the last sentence of KRS 159.070. For this vast majority of students—those in regular public day school—the nearest school provision of KRS 159.070 is obviously unaffected by KRS 159.010(1). Only those students who have special educational needs or desires that will not be met in the "regular public day school" must attend the particular school provided by the school board to satisfy those special concerns.

The Majority's interpretation of KRS 159.010(1) wholly ignores the differentiation drawn between the sending of a child to the nearest regular day school *or* some

other school as designated by the school board and renders the first portion of the sentence wholly superfluous. If the Majority is correct, that statute could have been written to just simply say that a child may be sent wherever the school board decides she should be sent without all of the preliminary clutter about regular day schools. Instead, the Majority's strained interpretation ignores the fundamental principle of statutory interpretation, that *all* of the words of a statute should be given meaning, and writes the entire first portion of the sentence out of the statute.

In any event, even if one were to accept the Majority's strained reading of KRS 159.010(1), the school board, in making its provisions for which school a child would attend, would be subject to the other specific legislative mandates contained elsewhere in KRS Chapter 159, including the "nearest school" provision contained in KRS Chapter 159.070. *See Commonwealth v. Phon,* 17 S.W.3d 106, 107 (Ky. 2000) (When two statutes are in apparent conflict, a general rule of statutory construction mandates that the specific provision take precedence over the general.).

**B. The Statutory History Does Not Support the Majority's View That The Legislature Repealed the Parental Privilege Of Sending their Children to the Public School Nearest Their Home, Within Their School District.**

The Majority's reliance on the statutory history of KRS 159.070 is also misplaced. The Majority makes much of the fact that the predecessor version of KRS 159.070 contained a specific reference to "attendance" at the nearest public school, as follows: "Within the appropriate school district attendance area, parents or legal guardians shall be permitted to enroll *for attendance* their children in the public school nearest their home." (emphasis added). *See* House Bill 193, 1976 Ky. Acts, Ch. 79. As noted above, when the plain meaning of a statute is not absurd, it is improper to interpret the current version of a statute with reference to a prior version.[21] Also as noted above, this principle is vital under a government based upon the rule of law. It is untenable that citizens would have to resort to obsolete editions of the statute books to ascertain the meaning of a current statute, especially when that statute is not facially vague or ambiguous. The Majority concedes that this prior version of the statute "unequivocally granted the 'enroll for attendance' right" at issue in this case to all parents.

In *Rose v. Council for Better Education, Inc.,* 790 S.W.2d 186 (Ky.1989), this Court declared unconstitutional the entire statutory scheme for public education in Kentucky. Thereafter, the General Assembly was required to replace the entire statutory foundation for public school education, administration and funding. The former version of KRS 159.070 cited by the majority was re-enacted in 1990, and in the process of revision, the words "for attendance" were omitted from the statute. *See* 1990 Ky. Acts, Ch. 476. The Majority finds from this revision that the legislature specifically intended to repeal the "nearest school" provision by deleting from the law the parents' right to send their child to the nearest school, and replacing that right with the right for a parent to use the nearest school as a registration office, following which the school board could then

---

21. *Heringer v. Rolf,* 287 S.W.2d 149, 150 (Ky. 1956) ("Since there is no ambiguity in these statutes, reference may not be had to the former statutes for the purpose of construction."); *Lamie v. U.S. Trustee,* 540 U.S. 526, 534, 124 S.Ct. 1023, 157 L.Ed.2d 1024 (2004)("The starting point in. discerning congressional intent is the existing statutory text . . . and not the predecessor statutes.").

transport the student to any school in the district. In other words, by the Majority's construction, the legislature eviscerated a parental right of substantial magnitude simply by striking through an obviously redundant phrase. We find it incredulous that the legislature would undertake such a drastic reduction of parental rights by this subtle method, all the while leaving in place an equivalent phrase serving precisely the same function as the former phrasing. This approach is all the more incredulous when one considers the resulting statute is perfectly clear on its face and gives no hint of the supposed new meaning.

This critique of the Majority's view is even more compelling when we examine the policy that was actually *expressed* when the original version of KRS 159.070 was enacted in 1976 with the following "Emergency Clause:"

> Whereas, *thousands* of school pupils presently are required to leave their homes and return thereto several hours prior to and following regular school hours, thereby disrupting their lives and the lives of their families, an emergency is hereby declared to exist, and this Act shall become effective upon its passage and approval by the Governor.

KRS 159.070(2) (1976 version) (emphasis added). The foregoing is a powerful expression of legislative intent and purpose. It explicitly describes the primary legislative intention to prevent children from having to endure excessive and unnecessary time in school bus transit. There is no reason to believe, as the Majority would have us do, that the legislature abruptly and silently abandoned this purpose when, in 1990, it deleted a single, two-word redundancy in the statute.

The restatement of the statute in 1990 was merely a basic stylistic change that eliminated redundant language, and which was part of the much broader program of statutory reform associated with the substantive law changes brought about by the Kentucky Educational Reform Act. The terms "attend" and "attendance" are mentioned throughout the Act no less than nineteen times.[22] Indeed, the whole statute is about attendance in public school. The fact that the General Assembly, like all normal speakers of English, used the word "attend" is no indication that it adopted a unique, previously unheard-of and undefined meaning for the phrase "to enroll their children in" the school nearest home.

Thus, to the extent that the deletion of the words "for attendance" allows for a presumption that the legislature intended to impose a substantive change in the law, that presumption is easily rebutted here. *Inland Steel Co. v. Hall,* 245 S.W.2d 437, 438 (Ky.1952) ("in determining legislative intent certain presumptions are indulged. One of these is ... where a clause in an old enactment is omitted from the new one, it is to be inferred that the Legislature intended that the omitted clause should no longer be the law.").

The change here was obviously to omit a redundancy because, as explained, "enroll in a public school" denotes that one will be attending that public school. On a practical level, it is well known from commonsense experience that the legislature does not normally undertake such a seismic change in parental rights in such a subtle manner, so undetectable that it is perceptible only by professional educational administrators. I, therefore, reject the Majority's conclusion that "[i]ndeed, the omission

---

**22.** *See* attached Appendix to this dissenting opinion, which was tabulated by Justice Cunningham.

of the modifying prepositional phrase 'for attendance' must be viewed as purposeful legislative action" which "undercuts any suggestion that 'enroll' in the final sentence of the statute connotes a mandate that Kentucky children be enrolled for attendance at their nearest school."

Furthermore, the Majority utterly fails to address the principal question of *why*, if the legislature was "deliberate[ly] acting," did it use the language that the Majority now finds to be so confounding. Had repeal of the "nearest school" privilege been its true intention, the legislature could have simply said, "Within the appropriate school district attendance area, parents or legal guardians shall be permitted to enroll their children **for administrative purposes** at the public school nearest their home, **but the children may thereafter be assigned to any school within the district at the school board's discretion."** *That* would be deliberate action worthy of the seismic change in parental rights at issue in this case.

Further, with regard to the recently proposed legislation during the 2011 and 2012 sessions, rather than "giving further credence" to the Majority's conclusion "that the enrollment referred to in the last sentence of KRS 159.070 does not connote an attendance right," the better view is that such proposals merely suggests that their sponsors were well acquainted with the present litigation, and knowing the contortion that was afoot, sought to eliminate any claimed misperception about the meaning of the provision. The proposed legislation reflects that the legislature did *not* intend, with this aspect of the 1990 amendments, any substantive change to KRS 159.070.

*C. The Placement of the "Enrollment in the School Nearest Home" Provision in KRS 159.070 Does Not Limit Its Application to Public School Districts That Have Split Apart or Joined Together.*

After examining the text of the first four sentences of KRS 159.070, the Majority concludes that "an examination of [the statute] in its entirety discloses a statute focused on a united school district and attendance matters within that district as well as potential dissolution of a unified district and the return to separate districts." Thus, they conclude, the final sentence of KRS 159.070 that permits parents to enroll their children in the school nearest home does not apply uniformly across the state. We disagree. The "focus" of KRS 159.070 is *not* limited to the unification and dissolution of school districts. After all, the opening clause of the statute is "[e]ach school district shall constitute a separate attendance district," and thus the statute obviously refers to *every* school district and attendance district in the whole Commonwealth—not just the ones that have united and/or dissolved back into separate districts. Much of the discussion in the first four sentences is, indeed, about the potential of contiguous school districts to unite and separate. But, in light of the opening clause, the statute obviously applies as well to schools systems that have never, and never will, unite or separate. Furthermore, it would be ludicrous to suppose the legislature would confer the right of enrollment in the nearest school only to parents who reside in school districts which have united and/or separated. Why would the special privilege of being allowed to send their children to the nearest school be granted only to parents located in districts which have united and/or separated, but denied to parents of other districts?

Moreover, the provision in dispute is in exactly the same statutory location as it was *prior to* the 1990 amendment, and the school boards and Majority has plainly conceded that prior to 1990 the statute provided *all* public school parents in *all* districts with the option to send their child to the nearest school. And, we know from

the above-quoted Emergency Clause enacted when the provision first went into KRS 159.070 that its expressly-stated purpose was to minimize time students in all parts of the Commonwealth spend on school buses. The location of the provision in its statutory context has never changed. The fact that it remains codified where it always has been, at the end of KRS 159.070, cannot now suddenly indicate that it applies only to a limited group of school districts, as the Majority contends.

Further, there is a very practical reason the legislature would place the provision where it did. With the potential for contiguous school districts to unite and separate and re-unite again, absent a specific statutory protection, there is a danger a child would be re-assigned to schools all about the district as the districts unite and divide. Thus, contrary to the Majority's assertion that the placement of the provision indicates a legislative intent that should apply only to instances involving the uniting and separating of school districts, the placement of the provision in the last sentence of KRS 159.070 emphasizes that important social, policy of allowing children to be enrolled in the school nearest to their home when the districts separate or unite.

It is self-evident that what the legislature meant by the final sentence is, during all of the potential turmoil associated with uniting and separation, the one thing that does not change, and which is to be respected, *is the parents right to send their children to the public school nearest their home within their school district.* By

placing the provision at this location, the legislature emphasized that all parents were to have this privilege.

*D. The Plain Meaning of KRS 159.070 is Consistent with other Chapters of the Kentucky Revised Statutes, and With the Prior Opinions of This Court dealing with KRS Chapter 159.*

The final section of the Majority opinion purports to "harmonize KRS 159.070 with other parts of the Kentucky Revised Statutes beyond Chapter 159" and "prior decisions of this Court." More specifically, the Majority seeks to harmonize KRS 159.070 with KRS 160.290(1). KRS 160.290(1) provides, "Each board of education shall have general control and management of the public schools in its district and may establish schools and provide for Courses...." However, whatever powers of general control and management were conferred upon schools boards by KRS 160.290(1) would be subordinated and subject to the "nearest school" provision of KRS 159.070.[23] *Commonwealth v. Phon,* 17 S.W.3d at 107 (specific statutory provisions control over general provisions). Further, *Hines v. Pulaski County Bd. of Ed.,* 292 Ky. 100, 166 S.W.2d 37, 38 (1942), is distinguishable because in that case, there were exigent circumstances in that the nearest school was over-crowded.[24] The other case cited by the Majority was also an overcrowding case, and so it, too, is unpersuasive. *See Skinner v. Bd. of Ed. of McCracken County,* 487 S.W.2d 903 (Ky.1972)(Taxpayer-parents of school children sought to enjoin the county board of education and superintendent of county schools from implement-

---

**23.** This would be so regardless of the meaning of "enroll." Surely the Majority does not contend that a school board could refuse parents the option of enrolling their children in the school nearest their home, even if enrolling in school actually meant no more than registering a student in the school system.

**24.** In this vein, I would emphasize that there may well be administrative exceptions to KRS 159.070 born of necessity. It should go without saying, for example, that new school construction may lag behind population growth in a given area. Based upon the holding in *Hines,* I have no hesitancy in recognizing overcrowding as one such necessity.

ing a plan that, due to overcrowding at two schools, would transport students to other schools.).

## IV. CONCLUSION

In summary, the Majority ignores the plain meaning of the statute now before us, and thereby disregards the settled legal principles that compel the courts to apply a statute as it is written, except when doing so produces injustice or an absurd result. The sentence "[w]ithin the appropriate school district attendance area, parents or legal guardians shall be permitted to enroll their children in the public school nearest their home" means exactly what it says, and what it says clearly and unambiguously to the "normal speaker of English" is that parents are entitled to send their children to the nearest school within their school district. To that extent, the decision of the Court of Appeals should be affirmed and this matter should be remanded to the circuit court for further proceedings. The Court of Appeals order to the Jefferson County School Board to submit to the court a "school assignment plan" for the 2012–2013 school-year should be reversed because further proceedings in the trial court are required before a final judgment imposing that kind of order could be appropriate.

CUNNINGHAM, J., joins.

## APPENDIX

### KENTUCKY EDUCATION REFORM ACT OF 1990, 1990 Kentucky Laws H.B. 940 (Ch. 476)

Additions indicated by "**bolding**"

Deletions indicated by "~~strikethrough~~"

KY ST § 159.010

Section 29. KRS 159.010 is amended to read as follows:

(1) Except as provided in KRS 159.030, each parent, guardian or other person residing in the state and having in custody or charge any child who has entered the **primary school program** ~~kindergarten~~ or any child between the ages of six (6) and sixteen (16) shall send the child to a regular public day school for the full term that the public school of the district in which the child resides is in session, or to the public school that the board of education of the district makes provision for the child to attend. A child's age is between six (6) and sixteen (16) when the child has reached his sixth birthday and has not passed his sixteenth birthday.

(2) An unmarried child between the ages of sixteen (16) and eighteen (18) who wishes to terminate his public or non-public education prior to graduating from high school shall do so only after a conference with the principal or his designee, and the principal shall request a conference with the parent, guardian or other custodian. Written notification of withdrawal must be received from his parent, guardian or other person residing in the state and having custody or charge of him sixty (60) days prior to withdrawal. The written notification shall be dated and the signature witnessed by the principal of the school or his designee, where the child is in attendance. During the sixty (60) day period the parent(s) and child shall be required to attend a one (1) hour counseling session where they shall view a media presentation prepared by the department of education which shows economic statistics and other information on potential problems of non-graduates.

(3) A child's age is between sixteen (16) and eighteen (18) when the child has reached his sixteenth birthday and has not passed his eighteenth birthday. Written permission for withdrawal shall not be re-

quired after the child's eighteenth birthday. Every child actually resident in this state is subject to the laws relating to compulsory attendance, and neither he nor the person in charge of him shall be excused from the operation of those laws or the penalties under them on the ground that the child's residence is seasonable or that his parent is a resident of another state.

**(4) The commissioner of education shall make a recommendation to the 1992 regular session of the General Assembly on raising the compulsory school age to eighteen (18) years of age for students who have not earned a diploma.**

## KY ST § 159.020

Section 30. KRS 159.020 is amended
to read as follows:

Any parent, guardian or other person having in custody or charge any child who has entered the **primary school program** kindergarten or any child between the ages of six (6) and sixteen (16) who removes the child from a school district during the school term shall enroll the child in a regular public day school in the district to which the child is **moved** removed, and the child shall attend school in the district to which he is **moved** removed for the full term provided by that district.

## KY ST § 159.035

Section 217. KRS 159.035 is amended
to read as follows:

**Notwithstanding the provisions of any other statute, any student** Anything in the statutes of the Commonwealth to the contrary notwithstanding, all pupils in a **public school** the schools of the state who is are enrolled in a properly organized 4—H club shall be considered present at school for all purposes when participating in regularly scheduled 4—H club educational activities, provided, the student is accompanied by or under the supervision of a county extension agent or the designated 4—H club leader for the 4—H club educational activity participated in.

## KY ST § 159.070

Section 218. KRS 159.070 is amended
to read as follows:

Each school district shall constitute a separate attendance district unless two (2) or more contiguous school districts, with the approval of the State Board for Elementary and Secondary Education, unite to form one (1) attendance district. Controversies arising in attendance districts relating to attendance matters shall be submitted to the State Board for Elementary and Secondary Education for settlement. and In case an agreement suitable to all parties cannot be reached, the State Board for Elementary and Secondary Education may dissolve a united district. In case of dissolution, each school district involved may unite with other contiguous school districts in forming a united attendance district or may act as a separate attendance district. Within the appropriate school district attendance area, parents or legal guardians shall be permitted to enroll for attendance their children in the public school nearest their home.

## KY ST § 159.080

Section 219. KRS 159.080 is amended
to read as follows:

(1) Each board of education shall, upon the nomination and recommendation of the superintendent, appoint a director of pupil personnel and such assistants as are deemed necessary. Salaries of directors and assistants shall be fixed by the board of education.

(2) Directors of pupil personnel and assistants shall have the general qualifications of teachers and, in addition, shall hold a valid certificate issued in accordance with the rules and regulations of the State Board for Elementary and Secondary Education. Certificates valid on January 1, 1956, for attendance officer shall hereafter be valid for the positions of director of pupil personnel. Such certificates shall be re-issued or renewed in accordance with the terms of the state board regulations applying at the date of issue.

(3) **Directors of pupil personnel and assistants shall be allowed their necessary and authorized expenses incurred in the performance of their duties. Each board shall bear the expense of its directors of pupil personnel and assistants incurred in its district.**

(4) **The office of the superintendent of schools shall be the office of the director of pupil personnel and suitable space shall be provided therein or adjacent thereto for him.**

## KY ST § 159.140

Section 220. KRS 159.140 is amended to read as follows:

The director of pupil personnel shall:

(1) Devote his entire time to the duties of his office;

(2) Enforce the compulsory attendance and census laws in the attendance district which he serves;

(3) Acquaint the school with the home conditions of the child, and the home with the work and advantages of the school;

(4) Ascertain the causes of irregular attendance and truancy, and seek the elimination of these causes;

(5) Secure the enrollment in school of all children who should be enrolled and keep all enrolled children in reasonably regular attendance;

(6) Visit the homes of children who are absent from school or who are reported to be in need of books, clothing or parental care;

(7) ~~Ascertain and~~ Report to the superintendent of schools in the district in which the child resides the number and cost of books and school supplies needed by any child whose parent, guardian or custodian does not have sufficient income to furnish the child with the necessary books and school supplies;

(8) Keep the records and make the reports that are required by law, by regulation of the State Board for Elementary and Secondary Education, and by the superintendent and board of education.

## KY ST § 159.160

Section 221. KRS 159.160 is amended to read as follows:

The principal or teacher in charge of any public, private or parochial school shall report to the superintendent of schools of the district in which the school is situated the names, ages and places of residence of all pupils in attendance at his school together with any other facts that the superintendent may require to facilitate carrying out the laws relating to compulsory attendance and employment of children. The reports shall be made within ~~the first~~ two (2) weeks of the beginning of ~~school in~~ each school year.

## KY ST § 159.250

Section 222. KRS 159.250 is amended to read as follows:

The director of pupil personnel of each school district, working under the direction

of the superintendent of schools, shall institute and maintain a complete, accurate, permanent and continuous census of all ~~enrolled~~ children between the ages of five (5) and twenty-one (21) enrolled in the public schools in the district. A child's age is between, five (5) and twenty-one (21) when the child has reached his fifth birthday and has not passed the twenty-first birthday. The school census shall specify the name, date of birth and sex of each child; the name, nationality and post-office address of each parent, guardian or custodian of the child; the school district in which the child resides; and the school in which the child is enrolled. The school shall be described by number and name. The census shall contain any other data required by the **chief state school officer** ~~superintendent of public instruction~~. Each board of education shall furnish its director of pupil personnel with assistance it deems necessary for the institution and maintenance of the census.

KY ST § 159.270

Section 223. KRS 159.270 is amended to read as follows:

No director of pupil personnel or other person shall **willfully** ~~wilfully~~ or fraudulently report a larger number of children of school age in any district than the actual number, or otherwise make a false report of the census to the **chief state school officer** ~~Superintendent of Public Instruction~~.