RENDERED: APRIL 18, 2019
TO BE PUBLISHED

# Supreme Court of Kentucky

## 2018-SC-000251-DGE

DIXIE MEINDERS AND
RHIANNON SCRONCE

APPELLANTS

V.

ON REVIEW FROM COURT OF APPEALS
CASE NUMBER 2017-CA-001096
MCCRACKEN CIRCUIT COURT NO. 16-CI-00679

DARYL K. MIDDLETON

APPELLEE

**OPINION OF THE COURT BY JUSTICE LAMBERT**

**AFFIRMING IN PART AND REVERSING IN PART**

This is a case concerning the custody of one child, CJS.[1] Appellant

Rhiannon Scronce[2] appeals the Court of Appeals' decision reversing the

McCracken Circuit Court's finding that Rhiannon qualified as CJS's *de facto*

custodian under KRS[3] 403.270. The following issues are also presented to us

in this appeal: (1) may the time period required to gain *de facto* custodian

status under KRS 403.270 be aggregated, or must it be continuous?; (2) what

constitutes the commencement of a legal proceeding to toll the *de facto*

---

[1] To protect the child's privacy, we will use his initials to identify him.

[2] Dixie Meinders remains a named party to this case. But, as custody and *de facto* custodian status were ultimately given to Rhiannon alone, and Dixie has not challenged that order, Dixie lacks the standing required to be a party to this appeal.

[3] Kentucky Revised Statutes.

custodian time requirement under KRS 403.270?; and (3) is a putative father who has taken no steps to establish paternity beyond obtaining a DNA test a "parent" for the purposes of KRS 403.270? For the following reasons, we affirm in part and reverse in part.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The facts surrounding this case are somewhat complicated and tremendously unfortunate. CJS was born in December of 2014. When CJS's mother, Jasmine Shoales, discovered she was pregnant she let Rhiannon and Dixie Meinders believe that Caleb Scronce was the child's father. Caleb is Rhiannon's brother and Dixie's son. Jasmine kept up this ruse throughout her pregnancy and for nearly a year after CJS was born.

In September of 2015, Dixie, still believing she was CJS's paternal grandmother, filed a dependency, neglect, and abuse petition and requested emergency custody (the "J" case). During the hearing on the petition, the trial court found that Jasmine's home had environmental issues with trash, insects, cleaners, and cigarette butts in reach of CJS. The court also found that Jasmine failed to give CJS an antibiotic that had been prescribed to him, and that the child was asthmatic, who was being exposed to cigarette smoke within the home. At the final adjudication hearing on November 5, 2015, the court granted temporary custody to Rhiannon and Dixie. CJS would reside with Rhiannon in Lexington and visit Dixie in Paducah.[4] Jasmine did not

_____

[4] Paducah and Lexington are roughly 255 miles apart.

2

appear at this hearing, and Caleb was incarcerated at that time. For some reason, the court also relieved the Cabinet of involvement at this stage of the proceedings, presumably because the Cabinet did not have custody.[5]

Four days after Rhiannon and Dixie received temporary custody of CJS through the combined adjudication and disposition hearing,[6] Jasmine filed two motions. One requested that the adjudication hearing be reset because she claimed she got the court date confused with other appointments and missed the hearing. The second motion requested a paternity test for Keith Middleton, the man we now know is CJS's actual biological father. The court ordered DNA testing, to be paid for by the mother, and set the next court date for December 10th. Due to the delay of the DNA results, the review was continued until January.

During the January hearing, DNA results confirming that Keith is CJS's father were presented and recognized by the court. Keith requested visitation, but the court denied his request citing the fact that he is a Missouri resident and the court "knew nothing about him." Instead, the court ordered a home study on Keith under the Interstate Compact for the Placement of Children.[7]

---

[5] This dismissal of the Cabinet leaves a parent, often with limited means, without assistance to make the necessary improvements to regain custody and is not helpful to reunification of children with their biological family.

[6] The appellate record does not contain a recording of the November 5, 2016, adjudication hearing where neither Jasmine nor Keith appeared. We are unable to ascertain who moved the court to waive the separate disposition, or why that would have been done, given the missing DVD.

[7] KRS 615.030.

3

This study never occurred. The final adjudication date was set for May 5, 2016.

On April 29, 2016, Keith moved to transfer custody. However, it became clear during the May 5th hearing that Dixie and Rhiannon were unwilling to relinquish their custody. Therefore, the parties and the court agreed that Keith would begin visitation with CJS and gradually receive more visitation time to "see how things go."[8] Jasmine did not attend this hearing, and the court suspended her visitation rights.

In September of 2016, Keith filed a separate civil action in Circuit Court seeking custody of CJS (the "CI" case). Rhiannon and Dixie filed a Response and Counter Petition for custody. As McCracken County has a family court, both cases were assigned to the same judge. On January 3, 2017, an Agreed Order was entered joining the "J" case and the "CI" case, and a final hearing date was set for May of 2017.

During the May 2017 hearing, the court heard testimony from Keith, Dixie, Rhiannon, and Tony Harris, a licensed counselor who testified on Keith's behalf. Jasmine was again absent. The court, relying on *Spreacker v. Vaughn*, 397 S.W.3d 419 (Ky. App. 2012), found:

> that as the child was never placed by the Cabinet and as the child is under 3 years of age, the length of time necessary to establish *de facto* custodianship is six (6)

---

[8] The Docket Order entered on this date actually says that the parties will "all work toward a transition to [Keith] having custody that is in [C.J.S.]'s best interest." However, in its Findings of Fact and Conclusions of Law, the court noted that the Order was entered in error. Unlike the Court of Appeals, we are satisfied that this cured the error.

4

months. The court finds specifically that the child has resided with RHIANNON for more than (6) months prior to the filing of MR. MIDDLETON's petition for custody, as MR. MIDDLETON did not commence a separate action to regain custody of his child as required by KRS 403.270(1)(a) to toll the (6) month period until his filing of September 6, 2016.

Rhiannon was therefore granted custody. Keith received two daytime visitations per month, and a minimum of four hours of visitation anytime Rhiannon was in Paducah with the child.

Keith appealed the custody order, and the Court of Appeals reversed. The Court of Appeals, relying on *Heltsley v. Frogge*, 350 S.W.3d 807 (Ky. App. 2011), found that Keith's April 29, 2016, motion to transfer custody was sufficient to toll the time required for Rhiannon to gain *de facto* custodian status. It therefore found that Rhiannon did not qualify for de *facto* custodian status and reversed the circuit court. This appeal followed.

Additional facts are discussed below as necessary.

## II.   ANALYSIS

Addressing the primary issue in this case, i.e. whether Rhiannon qualified as a *de facto* custodian, allows us to clear up some confusion surrounding KRS 403.207 and its corresponding case law. Namely: (1) whether the time period required for *de facto* status must be continuous; and (2) what constitutes the commencement of a legal proceeding sufficient to toll the time required for *de facto* status. These are questions of law and are therefore subject to de novo review. *Cherry v. Carroll*, 507 S.W.3d 23, 26 (Ky. App. 2016).

5

## A. THE TIME PERIOD REQUIRED FOR *DE FACTO* CUSTODIAN STATUS MUST BE CONTINUOUS

The portion of the statute at issue here is KRS 403.270(1)(a), which states:

> (1) (a) As used in this chapter and KRS 405.020, unless the context requires otherwise, "*de facto* custodian" means a person who has been shown by clear and convincing evidence to have been the primary caregiver for, and financial supporter of, a child who has resided with the person for **a period of six (6) months or more if the child is under three (3) years of age** and for a period of one (1) year or more if the child is three (3) years of age or older or has been placed by the Department for Community Based Services.

(emphasis added).

Rhiannon and Dixie assert that the period of time required for *de facto* status may be aggregated because the statute does not say "a *continuous* period of six months or more." They argue that a two-week period in the spring of 2015, when Jasmine was in jail and they took care of CJS, should be added to the period between November 5, 2015 and April 29, 2016; the period between Rhiannon getting custody and Keith filing his motion to transfer custody, respectively. They reason that if those two weeks were added to this five month and twenty-four-day period, the time period would total the requisite six months. We disagree.

"The cardinal rule of statutory construction is that the intention of the legislature should be ascertained and given effect...[t]hus, we first look at the language employed by the legislature itself, relying generally on the common

meaning of the particular words chosen." *Jefferson County Bd. Of Educ. v. Fell,* 391 S.W.3d 713, 718-19 (Ky. 2012). In this situation, ascertaining the intention of the legislature is fairly simple. Within the phrase "a period of six months," the operative word is "a." The word "a" when used in this context means one single thing. Therefore, the statute could be reworded to say, "one single period of six months" and still retain its original meaning. Obviously, if one were to aggregate two or more periods of time it would not be one single time period. Therefore, we cannot hold that the legislature intended to allow the aggregation of different time periods when it passed the *de facto* custodian statute.

Further, to allow a claimant to aggregate periods of time would undermine the purpose of the statute. Granting someone *de facto* custodian status gives that person "the same standing in custody matters that is given to each parent." KRS 403.270(1)(b). "[T]he Due Process Clause of the Fourteenth Amendment protects the fundamental right of parents to make decisions concerning the care, custody, and control of their children." *Troxel v. Granville,* 530 U.S. 57, 66 (2000). Therefore, a process that puts a third party on equal footing with a parent is not one to be taken lightly. It is a high burden, and rightfully so. To allow a third party to aggregate periods of time to add up to six months—or a year, depending on the child's age—would drastically lower the burden of proof in comparison to proving the child lived with them continuously for the requisite time.

We therefore hold that the period of time required to qualify for *de facto* custodian status under KRS 403.270 must be one continuous period of time. Thus, neither Rhiannon nor Dixie qualify as *de facto* custodians.

## B. FILING A SEPARATE CUSTODY ACTION IS NOT NECESSARY TO TOLL THE TIME PERIOD REQUIRED FOR *DE FACTO* CUSTODIAN STATUS

The procedural history of this case demonstrates the existence of inconsistent case law from the Court of Appeals regarding what constitutes the commencement of a legal proceeding under the *de facto* custodian statute. The pertinent portion of that statute reads: "Any period of time after a legal proceeding has been commenced by a parent seeking to regain custody of the child shall not be included in determining whether the child has resided with the person for the required minimum period." KRS 403.270(1)(a). Here, the trial court applied *Spreacker v. Vaughn*, 397 S.W.3d 419 (Ky. App. 2012), and found that the time period had not been tolled prior to Rhiannon gaining *de facto* status. The Court of Appeals applied *Heltsley v. Frogge*, 350 S.W.3d 807 (Ky. App. 2011), and found the time period was tolled prior to Rhiannon gaining *de facto* status.

In *Spreacker*, the child's paternal Great-Aunt was babysitting the child for the weekend. *Spreaker*, 397 S.W.3d at 420. The child's mother was arrested that weekend, and the child's father was already incarcerated. *Id.* The Great-Aunt therefore filed a dependency, neglect, and abuse petition in Boyd County where the child resided and requested custody. *Id.* The court granted emergency custody to her on July 7, 2010. *Id.* During the

8

adjudication hearing on the matter, the child's parents admitted to neglect, and the court ordered that the Great-Aunt retain custody. *Id.* at 421. In January of 2011, the Great-Aunt filed a petition for custody in Greenup County, her county of residence. *Id.* The child's mother filed a response and motion to dismiss, which was denied. *Id.* At a hearing held in May of 2011, the court found that the Great-Aunt was a *de facto* custodian and awarded her custody. *Id.*

The Court of Appeals declined to address the issue of whether the time required for *de facto* status had been tolled because "[mother] admitted in a pleading that she 'did not commence a separate action to regain custody of her child, as required by KRS 403.270(1)(a) to toll the six-month period[.]'" *Id.* at 422. It therefore, albeit indirectly, held that an entirely separate proceeding must be filed in order to toll the *de facto* time requirement.

However, a strong dissent raised the issue *sua sponte* and argued that "the term commence, as used in the statute, means **participation** in an action litigating the custody of the child." *Id.* at 423 (emphasis added). The dissent further noted that requiring an entirely different action to be filed in order to toll the time period would be overly litigious, and "[c]ertainly the legislature did not intend to impose, on what may well be an impoverished parent, the expense of filing a second legal action at his or her own expense when an action for dependency, neglect or abuse was already pending." *Id.*

*Heltsley,* on the other hand, follows the line of reasoning presented by the dissent in *Spreacker.* In that case, the child's mother and father were

9

married but separated. *Heltsley*, 350 S.W.3d at 808. Prior to the separation, the child's maternal grandparents provided significant financial support to the family, and the mother and child stayed in the grandparents' home for a significant amount of time while the father was on active military duty. *Id.* Anticipating divorce proceedings, mother and child moved in with the grandparents permanently on January 14, 2007. *Id.* Three days after they moved in, the grandparents filed a dependency petition. *Id.* They were granted temporary custody on January 22. *Id.*

On February 23, 2007, the mother filed for divorce and sought to regain custody of the child. *Id.* The father responded to the petition on April 16, 2007, in a *pro se* response that requested joint custody and primary custodianship. *Id.* The grandparents were permitted to intervene in the action, assert that they were the child's *de facto* custodian, and request permanent custody. *Id.* The family court ultimately dismissed the grandparents' action, finding they were not the child's *de facto* custodians. *Id.*

The Court of Appeals agreed with the family court's finding that the father's April 16th *pro se* motion, though procedurally defective, was sufficient to toll the grandparents' *de facto* time period. *Id.* at 810. The basis for that finding was that the "[c]ommencement of a legal proceeding to regain custody does not necessarily require the filing of a new court case by a parent." *Id.* The Court of Appeals ultimately affirmed the family court, holding that

> [u]nder these circumstances, proper application of the law mandated denying Grandparents *de facto* custodian status. **Mother's petition, father's response, as well**

10

**as his motions, and finally his counsel's answer to Grandparents' intervening complaint** all occurred prior to the date on which Grandparents might have become *de facto* custodians under KRS 403.270(1). They **were sufficient steps to justify the family court's ruling** that Grandparents were not the primary caregivers for the statutory period.

*Id.* at 811 (footnote omitted) (emphasis added).

In the case at bar, we fail to see why the trial court applied *Spreacker* to these facts. The majority in *Spreacker* declined to address the issue of tolling because the mother admitted she did not commence a separate action. Here, Keith did file a separate custody action, and he argued there were numerous times the court could have found the time period was tolled. But more significantly, Keith appeared at every Court appearance in the dependency, neglect and abuse action, from November 19, 2015, when he first appeared and asserted he was the father and DNA tests were ordered and verbally moved the court for custody of his child at the next hearing on January 14, 2016 when the DNA results were reviewed.

Further, a trial court should never order a home study under these circumstances. The statute for ICPC, KRS 615.030, clearly states that it "shall not apply to: (a) The sending or bringing of a child into a receiving state by his parent[.]" This is because the statute requires that the state have custody of the child before it applies to any sending or receiving of the child to another state. Here, the state has never had custody of CJS. This is why the study never happened and why the trial court lacked authority to order the study.

11

This lack of authority is reflected in the record through a letter from the Missouri authorities.

Instead, we agree with the Court of Appeals' analysis and conclusion. As we have already discussed, *supra*, a parent's right to raise his or her child is a fundamental Constitutional right. And any process designed to take that right away should be fair and safeguard that right to the greatest extent possible. Therefore, we believe the process by which a parent may toll the *de facto* time period should be simple and easy. In addition, we believe it would be counterintuitive to require a parent to file a separate custody action when an active custody case already exists. There are expenses associated with filing a new case, and those cases will most likely be joined for convenience anyway.

Therefore, we now overrule *Spreacker* and hold that any direct participation in a child custody proceeding that demonstrates a parent's desire to regain custody of their child is sufficient to toll the *de facto* time requirement under KRS 403.270.

## C. RHIANNON DID NOT QUALIFY AS A *DE FACTO* CUSTODIAN

Applying this new holding to the facts of this case requires finding that Rhiannon did not qualify as a *de facto* custodian. CJS was under the age of three and was not placed in Rhiannon's care by DCBS.[9] Therefore, Rhiannon needed to be CJS's primary caregiver and financial supporter for at least six months to qualify for *de facto* custodian status. Rhiannon was granted

---

[9] Department of Community Based Services.

custody of CJS on November 5, 2015.[10] Keith appeared on November 19, 2015, to assert that he was the father, then appeared again at the January DNA results review and asked for custody of his child. The trial court specifically expressed its displeasure that Keith was now asserting his parental rights[11] and ordered that Missouri conduct an ICPC study of Keith's home and set a May Court date, which would have been past the six-month *de facto* status time period. Keith formally filed a motion to transfer custody on April 29, 2016. Even if we were inclined to require a written motion to toll de facto period, this motion to transfer custody was certainly sufficient to toll the Rhiannon's *de facto* custodian time period. But, we believe Keith's first appearance during the November 19th hearing was sufficient to toll the *de facto* period. This was a mere fourteen days after Rhiannon was granted custody. The trial court therefore erred by finding Rhiannon was CJS's *de facto* custodian.

CJS was only eleven months old when the Court and Rhiannon learned that Keith was his biological father, just days after CJS was placed with Rhiannon. CJS is now four and a half years old, and Keith has lost the irreplaceable bonding time that occurs between a parent and a child in early life. CJS has and will forever suffer from the confusion and changes that will

---

[10] Even though the trial court order gave temporary custody to both Dixie and Rhiannon, it was undisputed that the child actually lived with Rhiannon in Lexington.

[11] See exchange below.

13

naturally come from the trial court's refusal to recognize Keith's superior constitutional rights.

It is very troubling that the trial court expressed her displeasure when reviewing the court-ordered paternity test.[12] At the end of the January hearing, this exchange took place between Keith and the Court:

> Keith: At the preceding hearing, when we petitioned for the DNA, which I felt the court should have done a long time ago, it wouldn't have progressed this far—
>
> Court: When people come to court to say "he's the Dad," I don't order testing—
>
> Keith: Okay, we petitioned the Court for DNA—
>
> Court: You're going to put this on me and not on [Jasmine]?
>
> Keith: Your statement at the time when you read that petition was if we will determine the paternity and we are asking for custody to be returned to the father and you said you had no problem with that.
>
> Court: I have no problem with doing the DNA testing.
>
> Keith: You had no problem with the request.
>
> Court: For DNA testing, that's true, and we got the test now so we take the next step. Which is what to do from here. You're right, I did not have a problem with DNA testing, no one objected to the DNA testing.
>
> Keith: I just want my son back.

---

[12] The Court ordered Jasmine, who had previously been assumed to be indigent, to pay for the paternity test. Counsel had been appointed for Jasmine initially, but that counsel was dismissed as soon as Jasmine told the Court she planned to hire her own attorney.

Court: Okay, *well I'm glad you are taking an interest...No, I'm not glad,* but I see that you're taking an interest now in your child after your child has been cared for by another family and we're going to move forward from here. I'm going to order an ICPC on Mr. Middleton.

In addition, and more importantly,

> [T]he Due Process Clause does not permit a [s]tate to infringe on the fundamental right of parents to make child rearing decisions simply because a state judge believes a 'better' decision could be made. So long as a parent is fit, there will normally be no reason for the [s]tate to inject itself into the private realm of the family to further question the ability of that parent to make the best decisions concerning the rearing of that parent's children.

*Walker v. Blair*, 382 S.W.3d 862, 870 (Ky. 2012) (internal citations and quotations omitted). While Rhiannon's actions regarding CJS in this case are certainly admirable, Keith has not been found to be an unfit parent. His parental rights have not been terminated, and no dependency, neglect, or abuse proceedings or similar proceedings have been filed against him. We therefore remand and order that custody of CJS be given to Keith.[13] Keith has a fundamental right to raise his own child that supersedes any third-party entitlement. *Troxel*, 530 U.S. at 65-66 (holding that "the custody, care and nurture of the child reside first in the parents, whose primary function and freedom include preparation for obligations the state can neither supply nor

---

[13] Jasmine filed notice in the custody case that she agreed that sole custody be placed with Keith.

15

hinder."). For this Court to hold otherwise would be violative of that fundamental constitutional right.

## D. KEITH'S PATERNITY WAS ESTABLISHED BY THE COURT

Rhiannon's final argument is that, although a DNA test established Keith's paternity, he never filed a motion to establish paternity. She therefore asserts that although he is factually CJS's father, he is not legally CJS's father. This argument lacks merit.

First, KRS 600.020(46) defines "parent" as "the biological or adoptive mother or father of a child." In addition, once Keith's paternity test was presented to the trial court, it immediately began identifying him as CJS's father in open court and in subsequent orders. This was sufficient for Keith to gain the legal status of parent.

## III. CONCLUSION

For the foregoing reasons, we hold that: (1) the time period required for *de facto* custodian status under KRS 403.270 must be continuous; (2) any active participation by a parent in a custody proceeding evincing a desire to regain custody is sufficient to toll the requisite *de facto* custodian time period under KRS 403.270; (3) neither Rhiannon nor Dixie qualify as CJS's *de facto* custodian and both lack standing to assert custodial rights. Therefore, custody should be immediately placed with Keith as Jasmine has agreed that sole custody be placed with him.

16

All sitting. Buckingham, Hughes, Lambert, Keller, and Wright, J.J., all concur. Minton, C.J., concurring in result only in which VanMeter, J. joins.

Minton, C.J., CONCURRING IN RESULT ONLY: I agree with everything in the majority opinion except for its analysis and resolution of the first issue— whether KRS 403.270(1)(a) should be read to require a child to reside with an individual for a continuous or combined period of six months for that individual to attain de facto custodian status. In my view, that statute should be interpreted to allow for satisfaction of the six-month prong by combining the various times of the child's residency with the purported de facto custodian throughout the child's first three years of life.

For an individual to attain de facto custodian status, KRS 403.270(1)(a) requires that the individual "have been the primary caregiver for, and financial supporter of, a child who has resided with the person for a period of six (6) months or more if the child is under three (3) years of age[.]" I find unconvincing the majority's interpretation of the article "a" before the word "period" as evidencing that the General Assembly intended the requisite time period to be continuous. The fallacy in the majority's reasoning is revealed by considering the definition of "period": "[T]he completion of a cycle, *a series of events*, or a single action."[14] The word "period" does not simply designate one, continuous length of time, and the placing of the article "a" before the word

_____

[14] "Period." Meriam-Webster Online Dictionary. *2019* https://www.merriam-webster.com/dictionary/period (last visited Apr. 1, 2019).

"period" does nothing to change the definition of "period," which encompasses "a series of events."

As such, because the statute is ambiguous, in that it could require residency continually for six months or allow for a total amount of residency for six months, I employ the canon of statutory construction that instructs courts to "compare wordings[,] particularly within statutes of a similar type."[15]

KRS 405.021(1)(a) identifies when grandparents are to be awarded visitation rights: "The Circuit Court may grant reasonable visitation rights to either the paternal or maternal grandparents of a child and issue any necessary orders to enforce the decree if it determines that it is in the best interest of the child to do so." KRS 405.021(b) identifies a scenario for awarding grandparent visitation when a parent of the child is deceased: "If the parent of the child who is the son or daughter of the grandparent is deceased, there shall be a rebuttable presumption that visitation with the grandparent is in the best interest of the child if the grandparent can prove a pre-existing significant and viable relationship with the child." Most importantly, KRS 405.021(c) identifies the factors that "prove a significant and viable relationship under . . . (b):

    1. The child has resided with the grandparent for at least six (6) *consecutive* months with or without the current custodian present;

---

[15] Jill M. Fraley, *Scaled Legislation and New Challenges in Statutory Interpretation*, 101 Ky. L.J. 233, 252 (2012–13) (citing *Kasten v. Saint-Gobain Performance Plastics Corp.*, 563 U.S. 1, 8–10 (2011) (interpreting anti-retaliation statute by looking to other statutes containing anti-retaliation provisions); *Smith v. City of Jackson*, 544 U.S. 228, 233 (2005) ("[W]hen [the legislature] uses the same language in two statutes having similar purposes . . . it is appropriate to presume that Congress intended that text to have the same meaning in both statutes.")).

2. The grandparent was the caregiver of the child on a regular basis for at least six (6) *consecutive* months;

3. The grandparent had frequent or regular contact with the child for at least twelve (12) *consecutive* months[.][16]

The General Assembly knows how to mandate that a time period be interpreted to mean "consecutive" or "continuous" and when it is not to be so interpreted. By excluding such a word from modifying the word "period" in KRS 403.270(1)(a), it appears that the General Assembly meant to allow for combined time periods to satisfy the six-month requirement. This fact is further buttressed when considering that both KRS 403.270(1)(a) and 405.021(c) were amended in 2018, with the General Assembly leaving the language of KRS 403.270(1)(a) untouched while adding the language of KRS 405.021(b) and (c). The General Assembly could have added a word akin to "consecutive" or "continuous" to KRS 403.270(1)(a) at the same time it established such a requirement in KRS 405.021(c), but did not do so.

Our sister states offer guidance on this issue, as well: "[M]any states *allow the time to be piecemealed* so long as the requisite time period has been satisfied."[17] In particular, the Indiana Court of Appeals addressed this exact issue and interpreted its own statute that exactly mirrors Kentucky's: "'De facto custodian' . . . means a person who has been the primary caregiver for, and financial supporter of, a child who has resided with the person for at least . . .

---

[16] (emphasis added).

[17] Rebecca E. Hatch, *Litigation for De Facto Parent to Seek Child Custody of Visitation*, 143 Am. Jur. Trials 441 (Feb. 2019 update) (citations omitted) (emphasis added).

19

six (6) months if the child is less than three (3) years of age; or . . . one (1) year if the child is at least three (3) years of age."[18] The Indiana Court of Appeals in *A.J.L. v. D.A.L.* interpreted this language to allow for the combining of time periods to satisfy the residency prong.[19]

In *A.J.L.*, the aunt and uncle of three children sought de facto custodian status in relation to those three children.[20] The evidence adduced before the trial court included the aunt's testimony "that the Children had resided with her and Uncle fifty percent of the time from January 2006 to February 2007 and sixty to seventy percent of the time from February 2007 to February 2008."[21] The Court found the fact that the evidence did not establish a continuous period of residence for one year irrelevant for its disposition: "[T]he evidence is sufficient to show by clear and convincing evidence that the Children resided with Aunt and Uncle a majority of the time for unspecified non-consecutive periods over the preceding two years[.] . . . The trial court did not err when it concluded that Aunt and Uncle are the de facto custodians of the Children."[22]

Finally, I am unconvinced by the majority's assertion that "allow[ing] a claimant to aggregate periods of time would undermine the purpose of the statute" because "allow[ing] a third party to aggregate periods of time to add up

---

[18] IC 31–9–2–35.5.

[19] *A.J.L. v. D.A.L.*, 912 N.E.2d 866, 870–71 (Ind. Ct. App. 2009).

[20] *Id.* at 869–70.

[21] *Id.* at 870.

[22] *Id.* at 870–71.

to six months . . . would drastically lower the burden of proof" for those seeking de facto custodian status and infringe on a parent's constitutional right to raise his or her own child. At bottom, there is no difference between a child residing with another individual for a total or continuous period of six months before the child even turns three—in both situations the child has resided with another individual for six months.

In fact, I would argue that the majority's interpretation undermines the statute because it actually creates an absurd result.[23] Under the majority's interpretation, a deadbeat parent who has dumped his or her two-year-old child off on a loving caregiver could show up once every five months to comply with parental duties for a week, only to return the child in the care of that caregiver for another five months, thus preventing the loving caregiver from attaining de facto custodian status to seek, on equal footing with the parent, custody of the child. It would seem absurd to think that in that scenario, where the child has technically resided with that caregiver for almost the entirety of his or her life, the General Assembly would not have intended to bestow de facto custodian status on that loving caregiver, yet bestow de facto custodian status on an individual who has had a child reside with him or her for one, continuous period of six months that is actually less than half the amount of time the child resided with the previously-mentioned caregiver.

---

[23] *See Mills v. Dept. of Corrections Offender Information Services*, 438 S.W.3d 328, 334 (Ky. 2014) ("Of course, when interpreting statutes, we operate under the presumption that the legislature did not intend an absurd result.") (citations omitted).

21

Ultimately though, I agree with the majority's determination that Middleton's appearance at the November 19 hearing was sufficient to toll application of the six-month residency requirement, meaning that, even if one combines all the time that the child resided with Scronce, the six-month prong was not met. I agree with the majority's resolution of the case and its analysis and resolution of the other issues.

VanMeter, J., joins.

COUNSEL FOR APPELLANTS:

JOHN THOMAS REED
LAW OFFICE OF JOHN T. REED

LORI BETH SHELBURNE
GESS, MATTINGLY & ATCHINSON, PSC

COUNSEL FOR APPELLEE:

ANDREW KENNETH ASBRIDGE
OAKES LAW FIRM