RENDERED: JUNE 17, 2021
TO BE PUBLISHED

# Supreme Court of Kentucky

2019-SC-0476-T
(2019-CA-1156)

KENTUCKY RETIREMENT SYSTEMS                                         APPELLANT


ON APPEAL FROM FRANKLIN CIRCUIT COURT
V.              HONORABLE PHILLIP J. SHEPHERD, JUDGE
NOS. 17-CI-01307 & 17-CI-01308


JEFFERSON COUNTY SHERIFF'S OFFICE                                   APPELLEE


**OPINION OF THE COURT BY CHIEF JUSTICE MINTON**

**AFFIRMING IN PART, REVERSING IN PART, AND REMANDING**

We accepted transfer from the Court of Appeals of this administrative

appeal brought by the Kentucky Retirement Systems from the decision of the

Franklin Circuit Court in two consolidated cases arising out of the Jefferson

County Sheriff's Office.  These cases concern application of Kentucky Revised

Statute (KRS) KRS 61.598, which is commonly known as the pension-spiking

statute aimed at identifying artificial increases in creditable compensation to

public pension-member employees occurring in the last five years preceding

retirement with the effect of increasing the employee's retirement benefits.

The alleged spikes in both cases are partly due to a change in JCSO's

accounting method and partly due to the employees' accrual of overtime hours,

causing their gross compensation in at least one fiscal year to be greater than

the year before.  In neither case did the employees experience a bona fide

promotion or career advancement, so the Retirement Systems assessed JCSO for payment the increased actuarial costs attributable to the alleged pension spikes. JCSO disputes the assessments for several reasons.

We agree with JCSO that the Retirement Systems improperly applied KRS 61.598 to the pay spikes to the extent the changes in compensation were caused by an isolated transition in JCSO's new accounting method because that incident does not amount to an "increase" in compensation within the meaning of the controlling statute. But the Retirement Systems properly assessed the increased actuarial costs to the extent it was caused by regular overtime work and was not the result of a bona fide promotion or career advancement. We also find erroneous in different aspects the circuit court's reversal of the Retirement Systems's original assignment of the burden of proving a bona fide promotion and its interpretation of the statute. Accordingly, we affirm in part, reverse in part, and remand to the Retirement Systems to recalculate the assessments consistent with this opinion.

## I. FACTUAL BACKGROUND

JCSO is a participating employer in the County Employees Retirement System, which is part of the broader agency administering the public pensions under the umbrella of Kentucky Retirement Systems. JCSO employed Raymond Kaelin and Gus Harmon, Jr., full time, and each of them was a member of the Retirement Systems when he retired. Upon their retirements, the Retirement Systems reviewed the gross compensation of their last five years of services at JCSO and identified changes in gross compensation that the

2

Retirement Systems flagged as increases in creditable compensation exceeding 10%, and assessed the increased actuarial costs to JCSO. The cases were consolidated for purposes of judicial review, but each case presents slightly different facts.

### A. Gus Harmon, Jr.

Gus Harmon retired from JCSO in January 2015. The Retirement Systems reviewed the last five years of Harmon's gross compensation, which were as follows:

| Fiscal Year (identified later by first number) | Gross Annual Compensation | Percentage Difference from FY Prior |
| --- | --- | --- |
| 2009-2010 (FY09) | $44,028.03 | n/a |
| 2010-2011 (FY10) | $42,917.30 | -2.53% |
| **2011-2012 (FY11)** | $54,498.75 | +26.99% |
| 2012-2013 (FY12) | $43,810.86 | -19.61% |
| 2013-2014 (FY13) | $43,123.34 | -1.57% |
| 2014-2015 (FY14) | $22,050.74 | -48.87% |

The Retirement Systems sent a letter to JCSO reporting that it found a 26.99% increase in Harmon's creditable compensation in Fiscal Year 2011-2012 (FY11) and that it would assess increased actuarial costs to JCSO if the compensation increase was not related to a bona fide promotion or career advancement. In response, JCSO sent a Form 6481, Employer Request for Post-Determination of Bona Fide Promotion or Career Advancement, attaching a "missing paycheck" and time sheets for FY11. JCSO did not attempt to offer evidence of a bona fide promotion or career advancement. Accordingly, the Retirement Systems immediately determined the increase was not the result of a promotion, so it assessed the actuarial costs to JCSO.

3

JCSO appealed the determination, requesting an administrative hearing. At the hearing, the Hearing Officer's finding and recommended order agreed with the Retirement Systems that JCSO offered no evidence showing the apparent increase in creditable compensation was a result of a promotion or career advancement. The Retirement Systems's Board of Trustees adopted the finding and recommendation in its Final Order, assessing actuarial costs to JCSO. JCSO timely filed for judicial review in Franklin Circuit Court.

At least now, JCSO explains that Harmon's greater gross compensation earned in FY11 was the result of an accounting oversight that JCSO describes as a "missing paycheck" and overtime hours Harmon accrued that year as the sole JCSO employee assigned to maintain the JCSO fleet.

## B. Raymond Kaelin

Raymond Kaelin retired from JCSO in May 2015. The Retirement Systems reviewed Kaelin's gross compensation in each of the last five years of his employment according to KRS 61.598. Kaelin's gross compensation in those years was as follows:

| Fiscal Year (identified later by first number) | Gross Annual Compensation | Percentage Difference from FY Prior |
|---|---|---|
| 2009-2010 (FY09) | $49,510.41 | n/a |
| 2010-2011 (FY10) | $47,786.33 | -3.48% |
| **2011-2012 (FY11)** | $52,595.29 | +10.06% |
| 2012-2013 (FY12) | $53,634.50 | +1.94% |
| 2013-2014 (FY13) | $46,781.67 | -12.78% |
| **2014-2015 (FY14)** | $43,017.72 | +10.35%, annualized |

The Retirement Systems identified two increases in gross annual compensation in FY11 and FY14, the latter fiscal year's gross compensation annualized to account for Kaelin's mid-year retirement date in May 2015.

4

The Retirement Systems informed JCSO by letter that it identified two increases in annual compensation that were not attributable to a bona fide promotion or career advancement and that it would assess to JCSO the increased actuarial costs to the extent the compensation increases exceeded 10% over the prior year. In response, JCSO filed a Form 6481 for post-determination to which it attached a "missing paycheck" and time sheets for FY11. It did not supply any explanatory documentation for the apparent increase in FY14. JCSO did not, as it could not, offer any documentation showing either of the changes in gross compensation was the result of a bona fide promotion or career advancement. The Retirement Systems found no bona fide promotion or career advancement, maintaining its position that the assessment was proper.

JCSO timely sought an administrative hearing. At the hearing, JCSO argued to the Hearing Officer that the identified change in FY11 was actually an isolated discrepancy in gross compensation in FY10 caused by a "missing paycheck" in FY10 that was incorrectly attributed to FY11. Still, there was no explanation of the increase in FY14. Thus, finding no bona fide promotion or career advancement, the Hearing Officer ruled that JCSO must pay the assessment for actuarial costs caused by the apparent increases. The Retirement Systems's Board of Trustees adopted the recommended order as its Final Order for Kaelin's lack of a bona fide promotion or career advancement. JCSO timely appealed Kaelin's case to Franklin Circuit Court for judicial review.

5

## C. The "Missing Paycheck"

Both cases refer to a "missing paycheck," and we undertake to clarify to what that refers. According to JCSO's personnel supervisor, who testified at the administrative hearing, JCSO's accounting methods for reporting employee compensation to the Retirement Systems changed from a "when-earned" basis to a "when-paid" basis. This caused the compensation earned under a single paycheck to be shifted forward and attributed to the succeeding fiscal year, seemingly decreasing the gross compensation in the preceding fiscal year by the amount of the paycheck and consequently increasing the next fiscal year by the same amount. So, by simply comparing the gross compensation in each fiscal year, twice the amount of this paycheck accounts for at least a portion of the purported compensation difference identified by the Retirement Systems in FY11. Under the former accounting system—i.e., but for the change in JCSO's accounting methods—this paycheck would have been credited to the preceding FY10 instead of FY11. The affected deputies' job responsibilities did not change. Their hourly pay remained nearly the same throughout this change and really throughout the entire last five years' employment at JCSO. In fact, their compensation was fixed, adhering to unwaveringly a preexisting collective-bargaining agreement. Still, this explanation did not suggest any "bona fide promotion or career advancement" under KRS 61.598, so the Retirement Systems considered itself constrained by the spiking statute to issue the assessment.

6

**D. Franklin Circuit Court Decision**

The circuit court reversed the administrative decisions of both Harmon's and Kaelin's cases and remanded for further proceedings in Kaelin's case to clarify and justify the calculated "annualization" of his gross income in retirement year FY14.

The circuit court made three principal rulings pertinent to our review: (1) that the Hearing Officer erred by assigning the burden of proof in the administrative hearing to JCSO because the burden belonged to the Retirement Systems as it was imposing a penalty on JCSO; (2) that as a matter of statutory construction, KRS 61.598(5)(a) is only triggered where multiple increases are identified in the last five years of employment, so single increases year-to-year would not warrant an assessment; and (3) that so long as overtime compensation is "earned in good faith for a legitimate purpose" it should be considered as evidence of a bona fide promotion or career advancement. We disagree with each of these conclusions.

## II. STANDARD OF REVIEW

The Court may only overturn the decision of a public agency of the Commonwealth if the agency acted arbitrarily or outside the scope of its authority, if the agency applied an incorrect rule of law, or if the agency's decision is not supported by substantial evidence of record.[1] The facts of this case are not in dispute, so our review is limited primarily to the interpretation

---

[1] *R.R. Comm'n v. Chesapeake & Ohio Ry. Co.*, 490 S.W.2d 763, 766 (Ky. 1973).

7

and application of KRS 61.598 and questions of arbitrary agency action. The

application and interpretation of statutes we review de novo.[2]

### III. ANALYSIS

The version of the operative subsection of KRS 61.598 in effect at the time

Harmon and Kaelin retired read:[3]

> For employees retiring on or after January 1, 2014, the last participating employer shall be required to pay for any additional actuarial costs resulting from annual increases in an employee's creditable compensation greater than ten percent (10%) over the employee's last five (5) years of employment that are not the direct result of a bona fide promotion or career advancement.

*Bona fide promotion or career advancement* means:

> [A] professional advancement in substantially the same line of work held by the employee in the four (4) years immediately prior to the final five (5) years preceding retirement or a change in employment position based on the training, skills, education, or expertise of the employee that imposes a significant change in job duties and responsibilities to clearly justify the increased compensation to the member.

The primary questions in this appeal pertain to the proper application of the

statute to the facts. We review de novo.

### A. The Hearing Officer properly assigned to the employer the burden of proving a bona fide promotion.

We first address the burden of proof issue. KRS 13B.090(7) provides that

the burden of proof shall be placed on the administrative agency when the

agency action imposes a penalty or removes a benefit previously granted. In

---

[2] *Jefferson Cnty. Bd. of Educ. v. Fell,* 391 S.W.3d 713, 718 (Ky. 2012).

[3] The former subsection was KRS 61.598(2), but now contains nearly the same language, slightly amended in 2017, and situated under KRS 61.598(5)(a).

8

this case, the circuit court found the assessment was a penalty, concluding that the burden of proof should be assigned to the Retirement Systems. And the circuit court reasoned that because the assessments under the spiking statute function to deter or disincentivize abusive compensation practices and the Retirement Systems is the direct beneficiary of such cost assessments, that it must bear the burden of proving a lack of bona fide promotion. We disagree that these circumstances make the assessment a penalty.

The assessment of actuarial costs to the JCSO is not properly characterized as a penalty because the assessment is not a punishment for any wrong, breach, violation of law, or some other general infringement. Under this statute, the assessment is more accurately characterized as a fee or transaction cost of sorts, not a fine. This distinction is not merely semantic.

The triggering act, to increase the creditable compensation of an employee, is not an unlawful act. No law presented to us forbids an employer from increasing an employee's pay. While KRS 61.598 prescribes financial consequences of that employment decision, it is not because the legislature regarded the pay raise itself as wrong or disallowed. The statute merely provides that to the extent a compensation increase in the last five years of employment exceeds 10%, the attendant actuarial costs otherwise borne by the public pension system are to be shared to a greater degree by the employer. So we reverse the ruling of the circuit court in this case as to who bears the burden of proving a bona fide promotion, as it must be borne by the employer.

9

**B. The Retirement Systems partially misapplied KRS 61.598.**

As we explain in greater detail in a companion case issued today, to assess increased actuarial costs under the spiking statute, the Retirement Systems must demonstrate an actual *increase* in creditable compensation.[4] In that companion *JCSO* case, the employee deputy returned to work following a hiatus on unpaid sick leave. The unpaid time off caused a substantial decrease in the employee's compensation in one fiscal year. When he returned to work in the next fiscal year, his gross compensation returned essentially to the same amount as it had been in the years before he took sick leave. His hourly compensation and job duties had not changed at all. We held that the difference in gross compensation was not an "increase" in creditable compensation within the meaning of KRS 61.598. Under the circumstances, we regarded as significant that no substantive change was made in the mode or amount of the employee's compensation.

As in this case, the Retirement Systems's position was that the spiking statute's sole directive to the agency was to compare gross compensation year-to-year and wherever a positive difference appears between any two consecutive fiscal years not justified by a bona fide promotion, the Retirement Systems is statutorily constrained to assess actuarial costs. The Retirement Systems also argues here that it is not at liberty to look at any other explanations for the compensation increases that are not characterized as promotions or career

---

[4] *Jefferson Cnty. Sheriff's Off. v. Kentucky Ret. Sys.*, 2019-SC-0315-D (Ky. June 17, 2021) (hereafter, perhaps "*JCSO* case" or "*JCSO v. KRS*").

10

advancements. It argues that substantial evidence compels the result under KRS 61.598 and that reviewing courts may not set aside the factual findings of the Hearing Officer or ignore the plain language of the statute.

We do not disagree with the Retirement Systems's statement of the standard of judicial review of agency action. But as in the companion *JCSO* case, we disagree with the Retirement Systems's interpretation of KRS 61.598.[5] We hold that the Retirement Systems must in some circumstances inquire into the causes of differences in gross annual compensation because the statute applies only to "*increases*" in creditable compensation. We regard the Retirement Systems's application in the present case to be an overly mechanical application that itself ignores the plain language of the statute, resulting in arbitrary application.

Highly analogous to the case of the JCSO employee taking unpaid sick leave, to the extent an accounting change explains the difference in gross compensation between fiscal years, the difference in gross compensation is not an *increase* within the meaning of the statute. The superficial subtraction of a paycheck from one year and its addition to the next year cause, under the Retirement Systems's interpretation, an "increase" in compensation double the amount of the check with absolutely no other change to the deputies' pay. This is not an "increase" in creditable compensation, but an accident of accounting.

---

[5] *Id.* (Part II.A.).

11

This absence of "increase" is further evident considering other circumstances. As stated, nothing of substance changed with regard to the manner and amount Harmon and Kaelin both earned their pay per unit of time worked. In fact, actual compensation increases were limited by a controlling collective-bargaining agreement. The JCSO was not obligated or even at liberty under the collective-bargaining agreement to raise compensation of a deputy more than 2% per year.

Admittedly, the difficulty of applying KRS 61.598 is that it only expressly prescribes a comparison between two consecutive fiscal years, so the Retirement Systems's application up to this point is defensible under the language of the statute. But the reference under KRS 61.598 to compensation *increases* creates a substantive requirement. And to determine whether an employee's creditable compensation actually substantively increased, the employer may present and the Retirement Systems must consider evidence tending to establish whether the employer's compensation scheme for the subject employee actually changed between fiscal years.

As applied to this case, we acknowledge that accounting methods are important. But to the extent compensation was simply attributed to a different fiscal year based a change in accounting protocol, no substantive or actual increase in the employee's compensation can be said to have occurred. This accounting issue—the "missing paycheck" as JCSO calls it—would appear to explain at least part of the differences in gross compensation between FY10 and FY11. The Retirement Systems must adjust its calculation and

12

identification of compensation "increase" to exclude non-increase dollar amounts attributable to the accounting transition.

Harmon's purported 26.99% increase in FY11 is only partially explained by the accounting changes. The paycheck Harmon would have earned during the accounting change was $1,693.24. If Harmon's $1,693.24 check is subtracted from his gross compensation in FY11 and added to FY10 to account for the change, the difference between the fiscal years is still a positive difference of $8,194.97, an apparent increase of about 18.37% from year to year. This is 8.37% greater than the 10% allowed consequence-free. No bona fide promotion or career advancement appears to explain that 8.37%, so it constitutes a compensation increase subject to assessment under KRS 61.598.[6]

JCSO admits that much of this considerable difference, apparently 18.37% of it, is due to the accrual of Harmon's "genuine" overtime work in FY11. There is no real issue regarding the genuineness or good faith of Harmon's overtime work maintaining the department's vehicle fleet. But for purposes of determining assessments to employers under KRS 61.598(5)(a), as a calculation distinct from calculating employee benefits under KRS 61.598(2), there exists no exception for overtime pay. Increases in actuarial costs caused

---

[6] The Court acknowledges in advance the possibility of a discrepancy between the precise numbers used for the calculation in this opinion and those scattered through the briefs and record. We have no reason to question their accuracy, but note in anticipation that on remand, the Retirement Systems must simply verify and calculate the final assessment figures consistent with the conclusions and principles elaborated in this opinion. *See* KRS 61.598(5)(a).

13

by greater overtime work are subject to assessment. So the compensation difference in Harmon's case would constitute an "increase" as contemplated by the statute, absent a bona fide promotion or career advancement.

In Kaelin's case, the accounting change amounts for enough of the difference for the statute not to apply in one year. If the $2,653.88 check to Kaelin is subtracted from his gross compensation in FY11 and added to FY10, the difference between the years is only $1,199.59, or about 2.5% from year to year, less than the 10% allowed to employers without inquiry from the Retirement Systems. So KRS 61.598 does not apply to his pay in FY11, and the assessment was improper as to that purported "spike." But Kaelin's 10.35% increase in FY14 was not explained, and no bona fide promotion justifies it. If the Retirement Systems's calculation of that percentage was based on an annualized ratio as we gather from the record—and we take that to mean Kaelin's 2015 compensation was simply prorated based on a mid-year retirement—that calculation method is within the Retirement Systems's discretion to apply. The unexplained .35% over the baseline 10% is subject to assessment, and we do not disturb that finding if that was also the Retirement Systems's initial calculation.

The Court is, as it was in the case of unpaid sick leave, cautious in requiring the Retirement Systems to consider the factual context of purported compensation increases. This adds a complexity to the Retirement Systems's substantive inquiry and appears to impose a greater burden on it than appears

14

in KRS 61.598 on its face. But avoiding arbitrary agency action compels this case-by-case approach.

That brings us to the next point, which is that KRS 61.598 imposes actuarial costs on employers where the employer's actions *incur* some sort of burden on the pension system. Yielding to the expertise and authority of the Retirement Systems in calculating actuarial figures, we assert that the statute implicitly targets employer actions that burden the pension system. While this Court cannot definitively rule out the possibility that an isolated change in accounting methods impose such a burden, we must express skepticism. We cannot help but question how, as applied to the present cases, these isolated slips in the accounting system make an employee's prospective retirement more costly to the pension system. If the current calculation method is figuring actuarial costs where there actually are none, then the method is arbitrary to that extent, and it would fail to further the legislature's intent and the statute's plain language. It suffices to say that the Retirement Systems may only impose assessments on participating employers where an employment decision or circumstance *actually* and *nonarbitrarily* increases the financial burden of the employee's retirement on the pension system. If there is a true "increase" in compensation over 10%, and that increase *actually* incurs some sort of cost to the pension system under an actuarial formula, assessing the cost to the employer is authorized by statute. But the directive to shift "actuarial costs" to an employer implies the existence of actuarial costs in the first place.

15

**C. The Retirement Systems properly identified one or more pay increases over 10% according to KRS 61.598 and was not required to find multiple pay increases in the aggregate.**

Again, this Court reviews issues of statutory interpretation and application de novo, respectfully owing no deference to the rulings of the lower court.[7] In this case, the circuit court held the statute applied only to an employer who gave multiple compensation increases in the preceding five-year period, that only "serial increases" in the prior five years triggered KRS 61.598. It found the use of the plural "increas*es*,"[8] in light of an amendment to another subsection referring to "any" (singular) increases indicated a legislative intent not to assess costs for single increases but only to address more abusive situations involving multiple increases. By contrast, the Retirement Systems's position is that any individual, discrete compensation increase over 10% between *any* of the last five fiscal years preceding retirement triggers the statute. We think the plain language of the statute supports the Retirement Systems's interpretation.

KRS 61.598(5)(a) reads:

[T]he last participating employer shall be required to pay for any additional actuarial costs resulting from *annual* increases in an employee's creditable compensation greater than ten percent (10%) over the employee's last five (5) fiscal years of employment that are not the direct result of a bona fide promotion or career advancement.

KRS 61.598(5)(a) concerning employer assessments must be understood with reference to Subsection (2) concerning the calculation of employee

---

[7] *Fell*, 391 S.W.3d at 718.

[8] (emphasis added).

16

benefits, which directs the Retirement Systems to "identify *any fiscal year* in which the creditable compensation increased at a rate of ten percent (10%) or more annually *over the immediately preceding fiscal year's* creditable compensation." The same over-10% compensation standard applies in both instances, and while the assessment provision (5)(a) speaks of plural "increases" in a general sense as a category, this does not imply a requirement of more than one increase to trigger an assessment. With the obvious relationship among the subsections and the care with which they appear to be drafted, one might expect the legislature to say outright that multiple increases are required if that were intended, that KRS 61.598(5)(a) applies where "more than one increase is identified in any five-year period." It did not evidently prescribe a different calculation method, so we find no such intention implied.

Instead, the Retirement Systems is to identify the last six fiscal years preceding retirement. Then, for each year except the earliest of the six, the Retirement Systems is to assess whether there is an increase over 10% in the gross creditable compensation in any year relative to the year immediately preceding it. In theory, five such increases could occur, and any single increase between any two applicable fiscal years exceeding 10% and not the result of a bona fide promotion would be subject to assessment for actuarial costs. Only after the resulting actuarial costs are determined for each discrete increase are the costs then aggregated, if there is more than one, and the employer is assessed that total cost.

17

Thus, as a matter of law, the circuit court erred. One or more discrete increases over 10% could occur between any of the five years and trigger examination and assessment from the Retirement Systems. In that way, the Retirement Systems properly applied the statute.

### D. Overtime does not have to be considered evidence of a bona fide promotion under KRS 61.598.

The circuit court in this case also held

> [I]f the increase was caused by overtime that was earned in good faith for legitimate purposes (and not artificially to spike compensation for purposes of enhanced retirement benefits), such an increase may constitute "significant change in job duties" that would satisfy the requirements of the statute to justify the increase without penalizing the employer.

The circuit court then required that evidence of overtime compensation be admitted and considered as evidence of a bona fide promotion or career advancement.

We disagree with the circuit court. The question is whether the Retirement Systems has the authority, statutorily and, therefore, constitutionally, not to regard an employee's overtime as evidence of a bona fide promotion where the overtime contributes to a spike in compensation. We hold the Retirement Systems was not required by the statute to consider overtime hours favorably to the employer, or at all. While the Court does not totally rule out the hypothetical case where overtime might be taken as evidence of a bona fide promotion, the statute does not require its consideration as such. The nature of overtime compensation will almost always cause it fail to show a qualitative change in employment to which the

18

term "bona fide promotions and career advancements" appears to refer. As a general matter, overtime is paid solely for the quantity of work done, while a change in job duties or position sufficient to constitute a bona fide promotion or career advancement is much more a *qualitative* change in job duties and responsibilities. A promotion does not generally just involve more shifts doing the same work, but different work itself.

We read the statute to direct the Retirement Systems to look to the substance of the reason for a compensation increase, but we hold that it may disregard overtime pay as evidence of bona fide promotions or career advancements. The Hearing Officer is entrusted with coming to a reasonable determination of facts based upon substantial evidence, having discretion in the manner and methods by which the Hearing Officer assesses the value and weight of evidence. And, as a matter of statutory construction, the General Assembly addressed overtime work as it contributes to other calculations, like employee retirement benefits under Subsection (2). It did not make a similar exception with regard to actuarial assessments to employers. The regulations excluding overtime pay are therefore consistent with the authorizing statute.

Further, although overtime may hypothetically constitute evidence in conjunction with other circumstances, its evidentiary value does not turn on the good faith authenticity of the overtime assignment as JCSO argues. To its credit, the circuit court's reference to "good faith" and "legitimate" purposes for the overtime accrued indicates the circuit court understood the propriety of looking at the substantial reasons for a pay increase. And it was justified in its

19

conclusion that Harmon's overtime stands in stark contrast to clearly excessive and abusive overtime compensation practices in other cases. But when the question is whether the courts should reverse an agency determination on a factual matter because the agency did not consider or value circumstances that are generally nonprobative, the court must decline to reverse.

Accordingly, we reverse the circuit court on this issue and affirm the finding and position of the Retirement Systems that overtime compensation is not to be considered evidence of a bona fide promotion or career advancement.

### E. JCSO's constitutional claims are without merit.

JCSO asserts various reasons why KRS 61.598 violates the federal and state constitutions. We address and reject each of them.

First, JCSO argues KRS 61.598 is arbitrary and overbroad, that it causes absurd results. We have largely addressed the basis of this argument by correcting the Retirement Systems's application of the statute to conform to legislative intent via statutory mandate. But even as a more general matter, the statute is not arbitrary, as it is a legislative economic regulation that is subject only to a rational-basis review. This statute is rationally related to a legitimate government interest, because it reasonably shifts costs to employers for larger unjustified compensation increases, with the purpose of preserving and stabilizing the public pension system that thousands of state employees rely upon. It is the legislature's prerogative to regulate the pension systems within its domain and to direct agency action in this way.

20

JCSO contends that the Retirement Systems's application of KRS 61.598 demonstrates the statute is overbroad because it would tend to assess costs to employers who do not engage in the pension-spiking behavior with which the legislature was primarily concerned. The statute was simply misapplied in the first instance in the way explained above. But even if it were properly applied, it is not overbroad. The overbreadth doctrine typically applies to constitutionally protected realms of behavior and action, particularly those recognized rights, especially fundamental rights, under the First Amendment and under the state constitutional counterparts.[9] This statute regulates and interacts with an employer's decision to increase a public employee's compensation, behavior which is not constitutionally protected, but is merely constitutionally permissible. It is an economic activity subject to reasonable intervention and regulation by the state. Employers are afforded a sufficient degree of procedural due process under the statute itself, and this treatment is reasonably tailored to suit a legitimate government interest. Thus, the overbreadth doctrine does not apply.

Next, the language of KRS 61.598(5)(a) reaches back to apply where an employee has retired after January 1, 2014, but before July 1, 2017, even where the compensation in question was paid before the date of the statute's enactment in July 2013. JCSO argues this is an ex post facto law and a law

---

[9] *See Commonwealth v. Kash*, 967 S.W.2d 37, 42 (Ky. App. 1997); *Commonwealth v. Ashcraft*, 691 S.W.2d 229, 232 (Ky. App. 1985).

21

impinging preexisting contracts. These constitutional claims are also without merit.

Briefly, prohibitions against ex post facto laws apply to criminal matters. The present proceedings do not involve criminal matters.[10] And no contractual rights or obligations of the JCSO's are affected. The relationship between the Retirement Systems and JCSO is not a contractual one, but a statutory one.[11] The relationship between JCSO and its employees is determined by a collective-bargaining agreement from which, according to the JCSO's own uncontradicted witness, JCSO never deviates. In other words, there was no effect on the rights and duties under the employment relationship.

JCSO argues the law infringes the rights of its employees to earn a living under the Kentucky Constitution. Even assuming JCSO has standing to allege that, this argument was not preserved, so we decline to review it.

## IV. CONCLUSION

For the foregoing reasons, we affirm the trial court's reversal in Kaelin's case, and remand the case to the Retirement Systems with instruction to recalculate the assessment consistent with this opinion, an assessment which

---

[10] *Nicholson v. Jud. Ret. & Removal Comm'n*, 562 S.W.2d 306, 308 (Ky. 1978). *See also Beazell v. Ohio*, 269 U.S. 167, 169 (1925) ("It is clear that the 'ex post facto' prohibition applies only to criminal matters."); *Buck v. Commonwealth*, 308 S.W.3d 661, 664–65 (Ky. 2010); *Henderson & N.R. Co. v. Dickerson*, 56 Ky. 173, 177 (Ky. 1856) ("It is not an ex post facto law, for such laws relate exclusively to offenses against the public, and not to private wrongs and injuries.").

[11] *Ky. Emps. Ret. Sys. v. Seven Cnties. Servs., Inc.*, 580 S.W.3d 530, 546 (Ky. 2019) ("The relationship between [the Retirement Systems] and [the participating employer] is and always has been purely statutory.").

22

we conclude was proper only as to those increased actuarial costs attributable to .35% of Kaelin's compensation increase in Fiscal Year 2014-2015.

We reverse the trial court's decision to reverse in Harmon's case, as even a single spike can trigger the statute and overtime compensation is not exempt from assessment. In addition, we figure the actuarial costs resulting from 8.37% of the actual 18.37% increase in Harmon's gross compensation in Fiscal Year 2011-2012 is subject to assessment. Accordingly, the matter is remanded to the Retirement Systems to verify these figures and to recalculate the assessment consistent with this opinion.

Minton, CJ., Hughes, Keller, Conley, VanMeter and Lambert, JJ., sitting. All concur. Nickell, J., not sitting.


COUNSEL FOR APPELLANT:

Jillian Hall

COUNSEL FOR APPELLEE:

David Leightty
Priddy, Cutler, Naake & Meade, PLLC